## EDWARD LIVINGSTON'S EXECUTRIX, APPELLANT V. BENJAMIN STORY.

Louisiana. On the 25th July, 1822, Livingston applied to, and obtained from Fort & Story, a loan of 22,936 dollars, on a security of a lot of ground in New Orleans, on which stores were then being built. This sum was received, part in cash, part in a promissory note, and 8,000 dollars were to be paid to the contractor for finishing the stores on the lot. The property was conveyed by Livingston, to Fort & Story, by a deed of absolute conveyance; and he received from F. & S. a *counter letter*, by which they promised to reconvey the property to him, if, on or before the 1st of February, 1823, he paid them 25,000 dollars. By the *counter letter*, on payment of the loan, the property was to revert to L.; if not, it was to be sold by an auctioneer of the city of New Orleans, and the residue of the proceeds of the same paid to L.; the money advanced by F. & S., with the interest and the expenses, being first deducted. The agreement for building the stores was transferred by L. to F. & S., and they agreed to pay the 8,000 dollars, as the work proceeded, in instalments. On the 1st of February, 1823, the buildings had not been completed, and F. & S. agreed that the payment of the sum due on that day should be postponed until the 2d June, 1823; the sum of 25,000 dollars, to be increased to 27,500, being at the rate of eighteen per cent. per annum, for four months, and the residue for expenses of selling the property at auction, &c. An agreement was made, that if the amount named should not be paid on the 1st of June, 1823, the property should be sold at auction, and after the repayment of the sum of 27,500 dollars, the expenses of sale, &c., the residue should be paid to L. By the same agreement, the counter letter was to be delivered up, and the record of it cancelled. On the 2d of June, the money not being paid by L. to F. & S., it was agreed, that if on or before the 5th of August, 1823, the sum due, with interest, at eighteen per cent. per annum, to amount to 27,860 dollars, 76 cents, should not be paid by L. to F. & S., the lot, and all the buildings, should become the full and absolute property of F. & S. The money was not paid; and F. & S. protested, as they had done on the 4th of February, for noncompliance with the agreement to pay the money agreed to be paid. From this time, F. & S. continued in possession of the lot and the buildings, until the death of Fort, in 1828; when S. purchased the share which had belonged to F., and he holds the property to this time. The evidence in the case showed, that after July, 1822, the contractor did not apply the 8,000 dollars to the completion of the stores on the property; and although F. & S. knew that he was so neglecting to apply the funds, they continued to pay over the same to him, in weekly payments, according to the contract. In 1832, L. having become a citizen of New York, filed a bill in the district court of the United States, for the eastern district of Louisiana, claiming to have the property held by S., reconveyed to him, on the payment to S. of the sum due to him, and interest on the same, deducting the rents and profits of the estate; or that the same should be sold according to the terms of the counter letter; and after the payment to S. of the amount due to him, with interest, the same deductions having been made, that the balance remaining from the sale should be so paid to him. By the Court.—After much inquiry and

[Livingston v. Story.]

deliberation, and a comparison of the civil code of Louisiana, with the civil law from which it derives its origin, and with which it is still in close connexion, we have come to the conclusion that the original contract, and counter letter, constituted a pledge of real property; a kind of contract especially provided for by the laws of Louisiana, denominated, " an antichresis." By this kind of contract, the possession of the property is transferred to the person advancing the money. That was done in this case. In case of failure to pay, the property is to be sold by judicial process, and the sum which it may bring, over the amount for what it was pledged, is to be paid to the person making the pledge. In this case a provision was made for a sale by the parties, upon the failure of payment; but this feature of the contract is rather confirmatory of the contract and counter letter being an antichresis, than otherwise; for it is, at most, only a substitution by the parties of what the laws of Louisiana require. The decree of the Court was in conformity to those principles.

Under the law of Louisiana there are two kinds of pledges; the pawn, and the antichresis. A thing is said to be pawned, when a movable is given as a security: the antichresis is when the security given consists in immovables.

The antichresis must be reduced to writing. The creditor acquires by this contract the right of reaping the fruits or other rewards of the immovables given to him in pledge; on condition of deducting, annually, their proceeds from the interest, if any be due to him, and afterwards from the principal of his debt. The creditor is bound, unless the contrary is agreed on, to pay the taxes, as well as the annual charges of the property given to him in pledge. He is likewise bound, under the penalty of damages, to provide for the keeping and necessary repairs of the pledged estate; and may lay out, from the revenues of the estate, sufficient for such expenses.

The creditor does not become proprietor of the pledged immovables, by the failure of payment at the stated time; any clause to the contrary is null: and in that case, it is only lawful for him to sue his debtor before the court in order to obtain a sentence against him, and to cause the objects which have been put into his hands to be seized and sold.

The debtor cannot before the full payment of his debt, claim the enjoyment of the immovables which he has given in pledge; but the creditor, who wishes to free himself from the obligations under the antichresis, may always, unless he has renounced this right, compel the debtor to retake the enjoyment of his immovables.

The doctrine of prescription, under the civil law, does not apply to this case, which is one of pledge; and if it does, the time before the institution of this suit had not elapsed, in which, by the law of Louisiana, a person may sue for immovable property.

The 23d rule of this Court for the regulation of equity practice in the circuit courts, is understood by this Court to apply to matters applicable to the merits, and not to mere pleas to the jurisdiction; and especially to those founded on any personal disability, or personal character of the party suing; or to any pleas, merely in abatement. The rule does not allow a defendant, instead of filing a formal demurrer or a plea, to insist on any special matter in his answer; and have also the benefit thereof, as if he had pleaded the same matter, or had demurred to the bill. In this respect, the rule is merely affirmative of the general rule of the court of chancery; in which, matters in abatement, and to the jurisdiction, being preliminary in their nature, must be taken advantage of by plea, and cannot be taken advantage of in a general answer; which necessarily admits the right and capacity of the party to sue.

APPEAL from the district court of the United States for the eastern district of Louisiana.

The case, as stated in the opinion of the Court, was as follows:

The complainant, the appellant's testator, on the first day of February, 1834, filed a bill in equity in the district court of Louisiana, in which he stated himself to be a citizen of the state of New York, against Benjamin Story, a citizen of the state of Louisiana.

The bill charged, that some time previous to the 22d of July, 1822, the complainant, being in want of money, applied to the defendant and John A. Fort for a loan, offering as a security a lot in the city of New Orleans, on which a building, intended for stores, had been begun; that the defendant and Fort agreed to loan him twenty-two thousand nine hundred and thirty-six dollars; of which a part only was paid in cash, part in a note of John A. Fort, and eight thousand dollars of which was afterwards agreed between himself, the defendant and Fort, to be paid by Story and Fort, to one John Rust, a mechanic, who had contracted with the complainant, to complete the stores. That to secure the money borrowed, complainant conveyed to Fort and Story the lot of ground mentioned, and that cotemporaneously with the deed of sale, they executed, on their part, an instrument in writing, called *a counter-letter*, by which they promised, on the payment of twenty-five thousand dollars, on or before the 1st day of February, 1823, to reconvey to the complainant the property which he had conveyed to them. The complainant further charges, that of the sum of twenty-five thousand dollars to be paid by him on the 1st of February, a part of it was made up by a charge of interest at eighteen per cent. per annum, upon the amount of twenty-two thousand nine hundred and thirty-six dollars, actually advanced to him, and to be paid on his account to Rust, by Fort and Story.

The complainant also transferred his written contract with Rust to the defendant and Fort, rendering himself responsible for the proper employment of the 8,000 dollars; and which was to be paid Rust in weekly payments, by the defendant and Fort. Rust, on his part, consented to the transfer of his contract, and accepted Fort and Story in the place of the complainant. The stores were to be completed by Rust by the 1st of November, 1822, in a workmanlike manner; and all the materials, except those already provided, were to be found by Rust; and in his contract, he renounces all claim or

[Livingston v. Story.]

privilege upon the building beyond 8,000 dollars, which was to be paid him by Fort and Story, for the complainant. The deed and counter letter, and agreement with Rust, are in notes A, B, and C.

(A) *Deed.* In the city of New Orleans, state of Louisiana, on this 25th day of July, 1822, and in the forty-seventh year of the Independence of the United States of America, before me, Hughes Lavergne, a notary public, duly commissioned and qualified, in and for the city and parish of New Orleans, residing therein, and in the presence of the subscribing witnesses hereinafter named, personally appeared, Edward Livingston, of this city, counsellor at law, who declared to have granted, bargained and sold, and doth by these presents grant, bargain and sell, with all lawful warranty into John A. Fort and Benjamin Story of this city, merchants, here present, and accepting, all that parcel of ground situated on the batture of the suburb St. Mary, between Common and Gravier streets, measuring eighty-two feet, fronting Common street, one hundred and twenty-six feet, or thereabouts, fronting Tchoupitoulas street, one hundred and forty-six feet, or thereabouts, fronting New Levee street; and bounded on the other side by the lot of ground belonging to Messrs. Livermore, Morse, and Miller, and Pierce, containing one hundred and twenty feet, or thereabouts, the said parcel of ground sold, together with the buildings, improvements, and all other appurtenances to the same in any wise appertaining or belonging without any exception or reserve, the said purchasers declaring that they are perfectly acquainted with the premises, and do not wish for any further description of the same.

The above described property belongs to the said vendor by virtue of the compromise entered into between him and the heirs of Gravier, by act before Carlisle Pollock, notary public of this city, under date of the 3d of May, 1818, and is free of mortgage, as appears by the recorder's certificate delivered this day, and hereunto annexed. This sale is made for and in consideration of the sum of 25,000 dollars, which price the said vendor acknowledges to have received from the said purchasers, out of the presence of the undersigned notary and witnesses, renouncing the exception non numerata pecuniâ, and giving by these presents to the said purchasers a full and entire acquittance and discharge of the said sum of 25,000 dollars. In consequence of which payment the said vendor doth hereby transfer and set over unto the said purchasers, all his rights of property on the above parcel of ground and buildings thereon; consenting that they should take immediate possession of the said premises now sold, to have, hold, use, and dispose of the same as fully belonging to them by virtue thereof.

This done and passed, in my office, in the presence of John Baptiste Desdunes, junior, and Charles Janin, witnesses, residing in this city, who, together with me, the said notary, have signed this act after the same had been fully read and understood. The contracting parties having previously signed.

(B) *Counter-Letter.* Whereas, the said Edward Livingston, by act before H. Lavergne, notary public, hath this day sold and conveyed to said Fort and Story, a certain lot of ground, situated on the batture in front of the fauxbourg St. Mary, and designated as lot No. 1, on the plat thereof, deposited in the office of the said notary, together with all the buildings and improvements thereon, for the sum of twenty-five thousand dollars in cash :

Now, be it known, and it is the true intent and meaning of the parties to said deed of sale, that if the said Edward Livingston shall pay and reimburse to said John A. Fort and Benjamin Story, the aforesaid sum of twenty-five thousand dollars, on or

[Livingston v. Story.]

The complainant charges, that soon after the transaction, he left New Orleans; and that when he returned to it, he found that Fort and Story had paid to Rust 8000 dollars, on his account, but that little or nothing had been done toward the completion of the stores; so that if the property had been sold on the first of February, according to the terms of the counter-letter, it would not have pro-

before the 1st day of February, 1823, then, and in that case, the said Fort and Story stipulate and bind themselves to reconvey the said property above described, to said Edward Livingston. And in case of nonpayment of the said sum of twenty-five thousand dollars, on or before the day as above stipulated, then the said Fort and Story covenant and agree to cause the said property to be sold at public auction, by one of the licensed auctioneers of this city, after twenty days' public notice, on the following terms, to wit: twenty-five thousand dollars in cash, and the residue in equal payments one and two years: the purchaser giving satisfactory endorsed notes and special mortgage on the property until final payment. The said residue, after deducting the costs attending the sale, to be delivered over to the said Edward Livingston.

And the said Edward Livingston, on his part, having taken cognisance of this agreement, declares himself to be perfectly satisfied and contented therewith, and gives his full and free assent to the terms of sale and all the conditions as above stipulated.

(C) *Agreement with John Rust.* It is hereby agreed, between Edward Livingston and John Rust, as follows :

First, That the said John Rust engages, for the price hereinafter mentioned, to finish the sixteen stores now commenced and brought up to the ground floor, situated at the corners of Tchoupitoulas, Levee and Common streets, according to the plan and elevation signed by them and delivered to the said Edward Livingston; except that the said stores instead of three are to be only two stories high, to be covered in terrass. The whole to be finished by the 1st day of November next, in a workmanlike manner; and all the materials, except those already provided, to be found by the said John Rust.

And the said Edward Livingston agrees to pay to the said John Rust eight thousand dollars, in weekly payments of six hundred and sixty-six dollars each, during the progress of the work.

And the said John Rust declares that he renounces any kind of claim or privilege upon the said building beyond the said eight thousand dollars to be paid as aforesaid.

Know all men, by these presents, that I, Edward Livingston, for myself and my representatives, do hereby transfer and assign the within contract to John A. Fort, and Benjamin Story, they complying with the stipulations on my part therein contained ; and John Rust being here present, consents to the said transfer, and accepts the said John A. Fort and B. Story, in the place of Edward Livingston. Dated 25th of July, 1822.

I do further agree to allow the said weekly payment of six hundred and sixty-six dollars to be charged to me, rendering myself responsible for the proper employment thereof, by the said John Rust.

[Livingston v. Story.]

duced any thing like its full value. That under these circumstances he applied to Fort and Story for further time, which they would not consent to, but on certain conditions; which were, that the property should be advertised for sale, on the 22d of June, 1823; that the sum due them should be increased from 25,000 dollars to 27,500 dollars; which was so increased by the addition of 1500 dollars interest, at eighteen per cent. for five months, 800 dollars, for auctioneer's commissions, 50 dollars for advertising, and 150 dollars, arbitrarily added by the said Fort and Story. The complainant states, that being entirely at the mercy of Fort and Story, he consented to those terms, and executed a paper accordingly.*

The bill further states, that the complainant, on the 2d of June, in order to obtain a delay of sixty days, was forced to consent to sign a paper, by which it was agreed that the debt should be augmented to the sum of 27,830 dollars and 76 cents; and that if the same was not paid on the 5th of August, then the property should belong to the said Fort and Story without any sale.† But there is no clause by which

* " Agreement between Edward Livingston, and John A. Fort and Benjamin Story of the other part, as follows :

" 1st. The sale of lot No. 1, on the batture, with the buildings thereon, to be postponed until the 2d of June next.

" 2d. On that day it shall be sold by M'Coy and Company, unless sooner redeemed, after being advertised in the Courier de la Louisiane, in French ; and the Orleans Gazette, in English, from the 1st day of May previous to the sale.

" 3d. The conditions of the sale shall be 27,350 dollars cash, and the residue at one and two years with special mortgage; but in this sum is included 850 dollars, at which the auctioneers' commission, and charges of advertisement are calculated, which shall be deducted or reduced to what they shall really amount to if payment be made before the 1st of June.

" 4th. The overplus, after deducting the cash payment, is to be delivered to Edward Livingston.

" 5th. The counter-letter, executed by Messrs. Fort and Story, shall be delivered up, and the registry thereof annulled, immediately after the signature of this agreement, made by duplicates, this 4th day of March, 1823.

† In the city of New Orleans, state of Louisiana, on the 2d day of June, 1823, the forty-seventh year of the independence of the United States of America, before Mr. Hughes Lavergne, notary public, duly commissioned and qualified, in and for the city and parish of New Orleans, residing therein, and in the presence of the undersigned witnesses hereinafter named:

Personally appeared, Edward Livingston, counsellor at law of this city, on the one part, and John A. Fort and Benjamin Story, of this city, merchants, of the other part, which said appearances declared, that this being the day agreed on by contract, between Edward Livingston and the said Fort and Story, for the sale, at auction, of lot No. 1, situated on the batture, in the front of fauxbourg St. Mary; and the said

[Livingston v. Story.]

he should be discharged from the payment of the sum so borrowed as aforesaid, whereby he would have been liable to the payment of the sum so advanced in case the property had fallen in value; and the bill states, that on the 5th day of August, abovementioned, the said Fort and Story demanded, by a notary, the full sum of 27,830 dollars and 76 cents, which included the charge of 600 dollars for auctioneers' commissions for selling, although no sale had taken place, and all the other illegal charges above stated; and on nonpayment protested for damages and interest on the said sum, thereby showing their intention to hold him responsible for the sum demanded, if the premises should, by any accident, become insufficient in value to pay the same. Fort and Story remained in possession of the said premises until the death of the said John A. Fort, which took place some time in the year 1828; after his death the said Benjamin Story took the whole of the said property by some arrangement with the heirs of the said John A. Fort, and is now, and ever since has been, in the sole possession thereof; and the bill charges, that the said John and Benjamin, in the lifetime of the said John, and the said Benjamin, after the death of the said John, have received the rents and profits of the said property, to the amount of at least 60,000 dollars; and that the complainant is advised, and believes that he has a right to ask and recover from the said Benjamin Story the possession of the said property, and an account of the rents and

Edward Livingston having requested that said sale might not take place, for his own accommodation, the said Fort and Story have agreed to the said Livingston's request, on the following conditions, to wit: that on or before the 5th day of August, he, the said Livingston, shall pay to the said Fort and Story, the whole amount of the consideration money paid by them for the said lot, that is to say, the sum of 27,830 dollars 76 cents, and also any other sum they may be under the necessity of paying for the preservation of the said property; then the lot and buildings to revert to the said Livingston, and to become his property: and in case the said Livingston should fail, on the day abovementioned, to wit, the 5th day of August next, to pay to the said Fort and Story the sums above specified, then and in that case the said lot with all the buildings thereon, are to become the full and absolute property of the said Fort and Story; and the said Livingston hereby engages thereupon to surrender and cancel all and every writing or other document, in relation to said property, that may give to him any equity of redemption or other right to the same premises, it being the true intent and meaning of the parties, that in case of failure of payment, as aforesaid, that said lot, with all the buildings and appurtenances to the same belonging, are to vest in said Fort and Story a full title in fee simple forever.

Thus done and passed in my office, on the day, month, and year above written, in the presence of J. B. Desdunes, junior, and Charles Janin, witnesses, residing in this city, and requested to be present, who, together with the parties, signed this act, as well as me the said notary, after the same had been fully read and understood.

SUPREME COURT.

profits thereof, the said conveyance of the same from your orator having been made on a contract for the loan of money, and although in the form of a sale, in reality only a pledge for the repayment of the same; the act by which he agreed to dispense with the sale being void and of no effect in law.

The bill also prayed, "That an account may be taken, under the direction of this honourable court, between your orator and the defendants to this bill, in which your orator agrees he shall be charged:

" 1st. With such sum as shall be shown to have been advanced to him or paid on his account under the loan made to him on the 25th day of July, 1822, with the interest which he agreed to pay, of eighteen per cent. per annum, to be calculated upon each advance from the time it was made until the 5th of August, 1823, and after that time at legal interest.

" 2d. With all reasonable expenditures judiciously made and incurred by the said John and Benjamin, in building, repairing, and safe keeping of the said property, and that your orator be credited in such account with all such sums as the said John and Benjamin, or either of them, have received, or might, if they had used due diligence and care, have received from the said property; and that, in such account, the rents and profits be applied as the law requires: first, to the payment of the sums necessarily incurred in building and repairing; secondly, to the payment of interest on the sums which shall appear to have been advanced on the said loan; and, thirdly, to the discharge of the principal of the said loan.

"And that if, on said account, it shall appear that there is a balance due him, as he hopes to be able to show will be the case, that the said Benjamin Story be decreed to pay the same to him, and to surrender the said property to him; and that if any balance be found due from the complainant, that the said B. Story may be decreed to deliver the said property to him, on his paying or tendering to him the said balance; and that he may have such other relief as the nature of his case may require. That he, the said Benjamin Story, in his own right, and also as executor of the last will and testament of the said John A. Fort, or in any other manner representing the estate of the said John A. Fort, may be summoned to answer this bill; the complainant averring that he is a citizen of the state of New York, and that the said Benjamin Story is a citizen of the state of Louisiana, and now resides in New Orleans."

[Livingston v. Story.]

The protests, made at the request of John A. Fort and Benjamin Story, on the nonpayment of the money stipulated to be paid by Edward Livingston, on the 1st of February, 1823, stated, that on that day the notary had requested from Edward Livingston, payment of the sum of twenty-five thousand dollars, and was answered, that "he could not immediately pay the sum due to Fort and Story, but that he hoped soon to be able to do it." The answer to the demand made, stated in the protest of the 5th of August, 1823, to have been given by Edward Livingston was, "that owing to the very extraordinary scarcity of money, he was prevented repaying the money he had borrowed from Messrs. Fort and Story at this time, but was willing to allow them the same interest, at eighteen per cent., with good personal security, in addition to the real property they now have, for the renewal of the obligation for six months."

On the 17th of February, 1834, Benjamin Story appeared to the bill, and demurred to the same; alleging for cause of the demurrer, that the case made in the bill was not such a one as entitled the claimant in a court of equity of the state of Louisiana, to any discovery touching the matters contained in the bill, or any other matters, nor to any relief; and that by complainant's own showing in the said bill, that the heirs of John A. Fort, who is therein named, is a necessary party to the said bill; as much as it is therein stated, that all the matters of which he complains, were transacted with this defendant and John A. Fort, whose widow, the present Mrs. Luzenburg, is the sole heir and residuary legatee.

The district court sustained the demurrer, and dismissed the bill, on two grounds:

1st. "That this is not a suit that can be maintained in its present form, in a court of the United States, sitting in Louisiana."

2d. "That a material party is omitted in the bill."

The complainant appealed to the Supreme Court, and at January term, 1835, the decree of the district court was reversed, and the case remanded for further proceedings. 9 Peters' R. 632. On the 15th of December, 1835, Benjamin Story filed in the district court of Louisiana, an answer, on oath, to the original bill, in which he says, that he does not admit, but if it be the fact, requires proof that the complainant is a citizen of the state of New York, that at the time of the transaction mentioned in the bill, and for a long time thereafter, he was a citizen of the state of Louisiana, and one of her senators in the senate of the United States; and if he has ceased to be a citi-

[Livingston v. Story.]

zen of that state, the defendant knows not when or how, and calls for the proof.

And this defendant further answering, says, that he expressly denies, that on or about the 25th July, 1822, that he and John A. Fort agreed to lend to the complainant the sum of twenty-two thousand nine hundred and thirty-six dollars, or any other sum.

That he expressly denies, that any time, either jointly with the said Fort, or this defendant separately, ever agreed to lend to the said complainant any sum of money whatever, as alleged in the bill of complainant.

That so far from there having been any loan intended by the parties, this defendant states, that the negotiation for the sale of the said lot, commenced between John A. Fort and Nathan Morse, Esq., since deceased, the latter acting for the said complainant; and that one of them informed this defendant that the complainant wished to raise money on mortgage; but this defendant peremptorily and expressly refused to advance any money whatever to the complainant on mortgage. That during the progress of the negotiation, the complainant having learned that the defendant was to be interested in the purchase, and was to make the principal payments, mentioned to this defendant, that he would prefer obtaining money by mortgage on the property, rather than make a sale of it; and this defendant again repeated to him his refusal, and insisted upon a sale being made to him.

As evidence of the understanding of the parties, and of the real nature of the transaction, certain communications which had been addressed by the alleged agent of Mr. Livingston to John A. Fort and Story, were annexed to the answer.*

---

* To JOHN A. FORT, Esq., Present.

Messrs. John A. Fort and Story will oblige Mr. Livingston by sending in writing, their *definitive* terms, that is—

What sum will they give in cash: what sum they retain in their own hands to appropriate towards the building: what sums, and at what periods they give their notes: that they must have an absolute sale of the lot and buildings free from all incumbrances, and a transfer of the contract, and are to be put in immediate possession: the property to be returned in case the money is refunded punctually, at the expiration of        months.

To Mr. JOHN A. FORT, Present.

Messrs. Fort and Story are requested to meet at Lavergne's office, corner of Royal and St. Louis Street, this day, at 12 o'clock, for the purpose of completing the arrangements for the batture.

(Signed)                                              N. MORSE.

Friday, 26th July.

[Livingston v. Story.]

The sale was agreed to, and an act was passed. on the 25th of July, 1822, containing the clause of non enumerata pecunia. The answer refers to the different documents which have been stated, and referred to in the complainant's case.

The money not being repaid, as was provided in the counter-letter on the 2d of February, 1823, no sale of the property was made by auction, because of the request of the complainant; and on the 4th of March they made another agreement, (note ante, page 356,) by which they agreed to postpone the sale of the property until the 2d of June, 1823; and the said Edward Livingston, in consideration of allowing him such additional chance to repurchase the said lot and buildings, or obtain some person to purchase it, agreed to pay to them a compensation therefor, as is in said agreement stipulated; and in this agreement it is covenanted between the parties, that the counter-letter should be annulled and given up, so that there then existed between the parties the absolute bill of sale, and this stipulation of 4th of March, 1823. And finally, the 2d day of June, 1823, having arrived, and Edward Livingston would not pay the price of said property, nor was there any offer therefor, and at his request an agreement was entered into before H. Lavergne, a notary public, whereby the said Edward Livingston requested that the sale might not take place for his accommodation, and the said Fort and Story agreed thereto, on the following conditions: that on or before the 1st day of August, 1823, the said Edward Livingston should pay the said sum of twenty-seven thousand eight hundred and thirty dollars and seventy-six cents, and any further sum by them expended for the care and preservation of said property, and that then the said lot and buildings were to become the property of said Livingston; and in case the said Livingston should fail on the 5th August, 1823, to pay to the said Fort and Story the sums above specified, then the said lot, with the buildings thereon, were to become the full and absolute property of Fort and Story, and the said Livingston engaged thereupon to surrender and cancel all and every writing or other document in relation to said property, that might give to him any equity of redemption or other right to the said premises; it being in said act expressly stated, that it was the true intent and meaning of the parties, that in the case of failure of payment as aforesaid, that said lots, with all the buildings and appurtenances to the same belonging, are to vest in said Fort and Story a full, free, and absolute title in fee simple forever.

Vol. XI.—2 Z

The answer denied that at the time of the purchase, the property was worth more than the money Fort and Story paid for it, and that any loan of money was made; but it was an absolute sale, with power to redeem, which was twice extended to the complainant, and was finally closed by the last agreement; and on the 5th of August, 1823, a demand was made, and payment refused; whereby all clauses of redemption were annulled, by articles 93, 94, of the act then in force in Louisiana, and the property became absolutely and irrevocably the property of Fort and Story.

The answer also denies that the property has become as valuable as is represented by the complainant; and it states, that on the 10th of March, 1832, he, the respondent, by a purchase from the widow of John A. Fort, now Mrs. Luzenburg, became the owner of the moiety of the property which had belonged to John A. Fort, for which the sum of fifty thousand dollars was to be paid. A liability by Mrs. Luzenburg and her husband to repay this money in case of eviction, is alleged to exist under the laws of Louisiana, and that the purchaser has a right, under those laws to call on the vendor, to assist in his defence; "and the respondent submits to the Court, whether by the proceedings having been instituted in the district court of the United States, Mrs. Luzenburg is to be precluded from claiming and defending the ownership, when, being vendor, she is interested in the case."

The answer prays a citation to the widow of John A. Fort, who intermarried with Dr. Luzenburg; that they may appear and defend the sale, and abide by any decree of the Court.

To the answer, is annexed a statement of the moneys paid and received, on account of the estate, by the respondent, and John A. Fort. The sums paid for the estate from July 26, 1822, to May 27, 1827, amounted to fifty-one thousand five hundred and thirty-seven dollars and twenty cents. the interest at ten per cent., which is twenty-six thousand two hundred and sixty-one dollars and twelve cents; total seventy-seven thousand seven hundred and ninety-eight dollars and thirty-two cents; the sums received, up to January 26, 1829, amount to twenty-nine thousand seven hundred and five dollars and sixty-nine cents—interest seven thousand and seventy-three dollars and eighteen cents. Total thirty-six thousand seven hundred and seventy-eight dollars and eighty-seven cents. The answer claims the benefit of the proscription of five or ten years, under the laws of Louisiana, as constituting a bar to the suit.

Afterwards, on the 14th of March, 1836, the defendant filed an amended answer, stating, that Mary C. Luzenburg, the widow of John A. Fort, deceased, had, since the filing of the original answer, set up a claim to the moiety of the estate in controversy, and had instituted a suit in the judicial district court of the state of Louisiana, against the respondent, for the purpose of vacating the contract by which he became invested with a title to the interest of which Fort died possessed, and to recover the same from him; and as the claim is not admitted, but in the event of the success of the appellant, she and her husband would be liable to the respondent, and consequently, the rights of the respective parties could not be fully, fairly, and finally decided, unless Luzenburg and wife be made parties to this suit. The amended answer prays they may, by the complainant, be made parties to the bill.

A copy of the bill of Mrs. Luzenburg to the judge of the district court of the first judicial district of the state of Louisiana, is annexed to the amended answer. It alleges a sale of the moiety of the property which belonged to John A. Fort, to have been made to Benjamin Story, on the 10th of March, 1832, for fifty thousand dollars; when in truth and in fact, the said moiety was worth one hundred thousand dollars.

The testimony of two witnesses was taken in open court. Hughes Lavergne, the notary before whom many of the documents in the case had been executed, deposed, " Mr. Nathan Morse came to his office accompanied by Mr. Story, at the period named, for the purpose of making the sale above referred to. Mr. Morse appeared in this transaction to be the legal adviser of Messrs. Story and Fort; at this time Mr. Livingston was and had been for some time a member of the New Orleans bar, of great practice and celebrity, and it was not probable that Livingston would employ a lawyer to advise him.

Cross-examined by the defendant's counsel to the question, if deponent does not know that Mr. Morse was the financial agent of Mr. Livingston? He answers that he does not know that he was.

Money was very scarce in New Orleans, in 1822.

" H. Lockett, Esq. the agent of Mr. Livingston, deposed, that the complainant has not been in Louisiana since 1829; that he has written to deponent often, that he had changed his domicil to New York; he has property there and votes there.

" Cross-examined: deponent states, that Mr. Livingston was the

senator from Louisiana until the year 1831, when he was appointed secretary of state at Washington; it was then that Mr. Livingston changed his domicil to the state of New York; deponent never saw Mr. Livingston in New York, as he has never been there; but he has received letters, and still receives letters from E. Livingston, dated and postmarked New York."

On the 3d of June, 1836, the district court made a decree, that the bill of the complainant should be dismissed.

The complainant, Edward Livingston, having died, his executrix was made a party to the proceedings, and she prosecuted this appeal.

The case was argued by Mr. White for the appellant, and by Mr. Crittenden and Mr. Clay for the appellee.

Mr. White for the appellant.

An attempt is made by the appellee to raise up a question of jurisdiction in this case. If the right of Mr. Livingston to sue in the court of the United States in Louisiana, resting upon his having been a citizen of that state when the suit was commenced, is contested; the exception should have been presented to the district court of the United States in Louisiana, by a plea to the jurisdiction. Proof could then have been regularly given, that he became a citizen of New York in 1831, and continued such until his death, in 1836. Proof of this is in the record.

The whole of this attempt is made to cover the real character of this transaction; and it is sought to make it a sale of the property, and not a loan, as the penalties of usury are heavy under the laws of Louisiana. The facts of the case show that it was a loan by John A. Fort and Benjamin Story, to Mr. Livingston; of this the Court will be fully satisfied.

Nothing is so common under the civil law, as to make a deed of absolute transfer of real estate, and to take an agreement from the lender of the money, to secure whom the deed is made, which is called " a counter-letter." This is an advantage to the borrower; it puts him in possession of the evidence of the real nature of the transaction, and gives him full power over the deed of conveyance. The counter-letter is the contract between the parties. In this case it contradicts the answer of the defendant to the plaintiff's bill. He says it was an absolute sale of the land. That is entirely disproved by the counter-letter. The counter-letter shows it was not a sale, but

a loan on the security of the real estate; and the law of Louisiana takes charge of the borrower, and will not allow him, under the pressure of his difficulties, to surrender the protection the law gave him. A sale by an auctioneer, or a judicial sale, is required; and this the borrower cannot relinquish.

The purpose of the lenders was to embarrass the borrower, and thus prevent the redemption of the property. The stores were not completed, as they ought to have been; and as the contractor, Rust, should have been obliged by Fort and Story to complete them; they having an assignment of the contract for their completion. Nothing was done by them. Had the contract with Rust been insisted upon, and the stores completed, ample means to pay the whole sum borrowed would have been in possession of Mr. Livingston. The extravagant interest which was made a part of the consideration for the loan, would have been fully paid; and this most willingly. The appellant has no wish to escape from the payment of that interest; and he has instructed his counsel not to ask any thing which will prevent its allowance, according to the agreement.

The property, at the time of the transaction, was far greater in value than the amount loaned by Fort and Story. In 1832, it was worth one hundred thousand dollars. It is now of much greater value; and all the appellant asks, is, that she may be allowed to repay to the lenders, all they advanced, all they expended, and the legal interest on the amount since the debt became payable; taking back the estate, and having the advantage of the proceeds of it since that time. No injustice will be done by this settlement; and all parties should be satisfied with it.

This was not a conditional sale of the property by Mr. Livingston. It was a pledge of real estate, which cannot be enforced by a sale of the pledge without a judicial proceeding. This is what, in the civil law of Spain, is called "*antichresis.*"

The code of law prevailing in Louisiana, is difficult to be understood. It has grown up since the first establishment of the province. Originally it was adopted by a proclamation of Governor O'Riley, in 1768; and was afterwards confirmed by the king of Spain. This was "The Corpus jure Civilis," and the "Partidas," and "The Recopilacion de leyes de las Indias." The French inhabitants of the province became dissatisfied, and the "Les Coutumes de Paris," were declared to furnish the rules of practice: the principles of the established laws to remain in full force.

This was the state of things when the United States acquired the territory; and great embarrassments arose on the introduction of the provisions of the laws of the United States, and the forms of proceedings under the same. A code was prepared by authority of the legislature of the state, which is called the civil code, and is in most of its provisions the code Napoleon; and allows the Spanish laws to prevail, in all cases to which they will apply.

By the civil laws of Spain, the transaction was an antichresis; and by these laws Mr. Livingston was to be treated as a minor, and could, by no act of his, change the contract, far less dissolve or annul it. Civil laws of Spain, translated by Johnson, 149, 156. "A pledge must be sold by some judicial process. The right of property in a pledge cannot be transferred, except by some judicial proceeding, whatever may be the stipulations between the parties;" Ib. 159. The counter-letter stipulates that the surplus shall go to Mr. Livingston. Civil Code of Lou. article Pledge; tit. 22, art. 3100.

In article 3143, Civil Code of Louisiana, will be found the regulations relative to unremovable pledges, called antichreses; and article 3146, declares, that any clause which passes the property of a debtor on a failure to pay, is inoperative and void. At common law, the mortgagee may become the owner of the property by a release of the equity of redemption; but the civil law does not allow this.

Mr. White then read to the Court, an argument prepared by Mr. Hunt, of New Orleans, who was the counsel for Mr. Livingston, in the district court of Louisiana; to show the character of the loan, by the laws of the state of Louisiana, derived as they are from the laws of Spain and of France; and contending, that by the provisions of the law, the property was pledged, not sold; cited, 4 Kent's Com. 135, 136; Civil Code, 362, ch. 5, art. 91; Ibid. 344; 2 Vez. 405; Poth. Sale, art. 362; 5 Mass. Rep. 109; 9 Wheat. 489; Civil Code, 446; Tit. Pledge, art. 25; 12 Seirry, 20; 13 Ibid. 223; 7 Ibid. 872; 1 Martin's Rep. N. S. 417; Civil Code, 408, art. 12, 13; 2 Martin's N. S. 21, 4.

The authorities referred to in this argument, show that the whole transaction was one protected by the law.

The protests which Fort and Story made on the nonpayment of the sum borrowed, were intended to destroy the credit of the borrower; and thus prevent his obtaining from other sources the funds required for the redemption of the property.

[Livingston v. Story.]

In the case cited from 2 Martin's Reports, N. S. 21, 4, the Court will find the opinion of Judge Porter, showing that a right to land pledged, cannot be acquired without some judicial proceeding; and so all measures to destroy the rights of the original owner of the property, will be of no avail. Once a mortgage, always a mortgage; cited 4 Miller's Lou. Rep. 3, as to the nature and effect of a counter-letter.

Mr. Crittenden, for the defendant.

This is a suit in Chancery which has heretofore been before this Court. After it was remanded, the Louisiana court proceeded to enforce the decision of this Court. The defendant filed his answer to the complainant's bill, to which the complainant replied, and the cause was tried on its merits, and the court dismissed the bill with costs, from which this appeal is prosecuted.

The case attempted to be made out by the complainant in his bill, is, that he made a loan of the defendant and a certain Fort, was to give them an exorbitant interest; and, as a security for the repayment of the money advanced to him, that he conveyed the lot, which is the subject of controversy, in New Orleans, in mortgage.

On the contrary, the defendant denies, peremptorily and positively, that the transaction was a loan; and avers that he and his associate, Mr. Fort, absolutely refused to make any loan to the complainant. He denies that the conveyance of the lot in dispute is a mortgage. He alleges that the lot was purchased by him and his associate of the complainant; with a privilege secured to him of re-purchasing it by a given day. That this privilege, although extended from time to time, was never exercised by him; and that the lot, therefore, became the absolute property of the defendant and his associate.

The whole controversy, so far as the merits are concerned, turns upon the fact; whether the parties to the transaction intended a sale of the property, or a loan; and the conveyance of the lot as a security for the reimbursement of that loan.

The complainant sues as a citizen of the state of New York, and the defendant denies that he was a citizen of that state at the time of the commencement of the suit. The proof attempted on this point by the complainant is irregular, and not to be regarded. With the exception of that testimony, all the evidence is documentary. The transaction originated in an absolute conveyance of the property,

with a separate instrument, called a *counter-letter*, both under date of the 25th July, 1822; and by their terms it was to have been consummated on the 1st of February, 1823; but at the instance of Livingston, and in virtue of new agreements, materially variant from the first, this consummation was deferred to the 2d of June, and then to the 5th of August, 1823. By these new agreements, the *counter-letter* of the 25th of July, 1822, was *annulled;* and it was finally settled between the parties, that if Livingston paid the sum specified on or before the said 5th of August, 1823, the property should "revert to said Livingston and become his property;" and that if he should fail to pay by that day, then that said lot and appurtenances to be the "absolute property of the said Fort and Story;" the said Livingston to surrender and cancel every "writing or document that might give him any equity of redemption, or other right to the said premises: it being the true intent and meaning of the parties" that, in case of the failure of payment, &c., the said lot and appurtenances "are to vest in the said Fort and Story a full title in fee simple forever."

The main question in the cause turns upon the law of Louisiana, where the civil law prevails, and where they have no code of equity, nor of common law: except as it has been introduced, in a very limited extent, since the annexation of Louisiana to the United States.

1. The first question will be as to Mr. Livingston's right to maintain a suit in the district court of the United States for Louisiana. Should that be decided affirmatively, the

2d, And most important question is, was the original transaction between the parties, the case of a loan, or of a *bona fide* sale?

3. A minor question may arise, as to the parol testimony admitted, contrary to the usages of courts of equity, at the trial of the suit:

It is denied that the court had jurisdiction of the case; as Mr. Livingston was, at the time the suit was brought, a citizen of Louisiana. The answer denies his citizenship, and the proof which was given on the part of Mr. Livingston, by no means shows he had ceased to belong to Louisiana.

The appellees have full right to raise the question of jurisdiction here. Jurisdiction was denied in the district court, and evidence given upon the question. The Court will look at that evidence. If there is no jurisdiction, the Court will dismiss the cause. Having

been brought into question, and the whole of the testimony appearing which was given to establish it; this Court will consider the point as regularly before them; cited Brown v. Keene, 8 Peters, 125.

It is known, that when Mr. Livingston became the secretary of state, he was a citizen of Louisiana. While at the city of Washington, he could not acquire the right of a citizen in any other state; although it is admitted that a residence at Washington in the public service, could not affect his citizenship in the state from which he came. He could only become a citizen of New York, by actual residence there; and this did not take place until after he filed the bill in this case, in the district court of the United States for the eastern district of Louisiana. As to jurisdiction, cited 4 Cond. Rep. 127, note. Brown v. Keene, 8 Peters, 125.

The appellee, in this case, is protected by time. This suit was not brought until ten years after the transaction between the parties was closed. Civil Code of Louisiana, 302. The allegation of the operation of the act of limitation is in the case, and the Court will regard it.

Upon the merits of the case, the question will be, whether the arrangement between Mr. Livingston, and Fort and Story, was a sale of the property, or a pledge. The appellee asserts it to have been originally a conditional sale; which afterwards was made absolute by Mr. Livingston, who had a perfect right to make it such.

The provisions of the civil law, and of the Louisiana code, which have been referred to by the counsel for the appellant, apply to mortgages. If this was a case of mortgage, then the ability of the mortgagor to change it, and relinquish his right to have a judicial sale of the property, may exist.

It is difficult, under the common law, to distinguish between a conditional sale, and a mortgage. What this is, must be decided by the code, and by the decisions of Louisiana.

The counter-letter speaks of the deed from Mr. Livingston, as a conveyance; and the recital admits the transaction to be a sale. The purpose of the counter-letter, was to secure a reconveyance.

If the civil law allowed Mr. Livingston the ability to cancel the counter-letter, the evidence to show that he did so, and waived his right of redemption, is conclusive. The authorities cited by the counsel for the appellant, apply to admitted mortgages; and they have no application to this transaction, which never was a mortgage.

But if it had been such, still the right to release the equity of redemption, existed; and under the civil law, that right may, by agreement, be extinguished. Civil Code of Louisiana, 472.

The civil code of Louisiana, of 1808, was in force when this transaction took place. The provisions which apply to it, will be found in pages 344, and in 272, 274. The contract comes within the definitions of a conditional sale, in the articles referred to. A sale is, where one agrees to give a thing or property for a particular sum of money. This was a sale; but subject to an expressed condition, which suspended its operation for a certain time, within which the vendor had a right, expressly reserved, to cancel it.

The papers all show it was such a sale. It is no where called a mortgage, or a security for money loaned. The counter-letter does not contain an engagement to repay the money received from the purchaser of the property. The deed is absolute. The only stipulation is that of Fort and Story, to reconvey the property; but there is no obligation on the part of Mr. Livingston, to repay the money he had received. It is essential that there should have been such an agreement, to constitute a loan. Both parties, in the case of a loan, are bound; one to receive the money, when offered, the other to repay it, according to the agreement. It would be vain to search for such provisions in the instruments executed by the parties. They import any thing but such an arrangement.

But if, originally, it was not a sale, it afterwards became such. The surrender of the counter-letter, and the subsequent agreement of the parties, converted it into an absolute transfer of the estate; and this, after all the indulgence which Mr. Livingston had asked, had been fully conceded to him. The postponement from the 4th of March, 1823, was made at the instance of Mr. Livingston, and on entering into the agreement; which, after a further postponement from June to August, in the same year, he terminated, with his free and full consent; gave up all his right or claim on the property. The rights of Fort and Story thereby became absolute and irrevocable.

It is contended, that although this agreement was made, yet by the civil law it was of no avail, and was void. If this is not the law, then the agreement must have full effect. The Court must be satisfied that this is the law of Louisiana; and unless they are so satisfied, the decree of the district court will be affirmed.

The authorities referred to by the counsel for the appellant, if they have any application, apply to loans on mortgage, and they may show

[Livingston v. Story.]

that, in case of a mortgage, such agreements are void. They can have no other application.

It is true, that once a mortgage always a mortgage; but certainly a party may give up his right of redemption; Code of Louisiana, 472. Mortgages may be extinguished by paction or agreement. This is a paction, or agreement.

By the original agreement between the parties, the property was to be put up to sale; but Mr. Livingston afterwards gave this up, considering that this would be more advantageous than to offer the property for sale. Mr. Livingston was fully competent to do this; and yet it is contended by the appellant, that by some law of Louisiana, the power to do so is taken away.

If the transaction was a sale on condition, then it is not asserted that Mr. Livingston had no power to make it absolute. The civil code of Louisiana is explicit to this effect.

The very form of a sale, on condition, has been adopted in this case. The deed is an absolute and complete transfer; the counter-letter declares the conditions of the sale. This, by the civil code, is a paction, by which the vendor reserves the right to take back the property; and in the instrument the very terms of the law are adopted. May I not sell my property, on a condition that if I do not repay the money named, the estate shall be sold by auction; the proceeds of the sale to repay the same, and I to receive the residue? This may be done by our laws.

Courts of chancery have sought to make such a transaction between parties, more than they intended it to be: but the law of Louisiana will not allow this; Title Mortgage, art. 1, 452; art. 6, 452. Under the law of Louisiana, no conditional mortgage can exist between parties, except that which is expressly stipulated. None can be inferred from any thing but the express agreement of the parties. Authorities will sustain these positions; 1 Martin's Rep., New Series, 522, 528.

Strong apprehensions have prevailed in Louisiana, that in consequence of the decisions of this Court, in cases from the district of Louisiana, the laws of Louisiana are not to govern the cases which may be brought here; but that they are to be decided by the chancery law of other states, and by the chancery laws of England. This is an error in those who entertain such apprehensions. The courts of the United States adopt the forms of proceeding in chan-

cery cases, where they are brought into those courts; but they will apply the laws of the place to contracts made under them.

It has been said that the civil code of Louisiana is but a part of the law of that state, and that they have there, in full application, the corpus juris civilis, and the Partidas of Spain. Whatever system of laws prevailed before 1808, after that time the laws then established alone prevailed. After that time we are not to look to the laws of Spain, or of any part of the continent of Europe. In the formation of the code then adopted, such of the provisions of those laws as were approved, were taken from them; and Louisiana having a right to make her laws, did thus make them. No other code now exists.

By the law then established, the transaction in this case was a contract of sale on condition; and the time for the performance of the condition is not, by the law, permitted to be extended. After the time fixed, no redemption can take place. Possession of the property was given when the sale was made, and has continued from that time. This is stated in the bill. The possession shows the character of the arrangement, and proves that no mortgage, but a sale only, was intended.

The fact that it was a loan of money, and not a sale, is asserted in the bill; and in the answer this is denied, and it is asserted by the respondent to have been a sale. No proof to support the allegations in the bill is given, and the facts in the answer are to stand until disproved. This is the rule in chancery.

But if evidence were required to show that the negotiation was as represented by the respondent, it will be found in the notes which were written before it was concluded. Mr. Moss asks what sum Fort and Story will give for the property, to be redeemed by Mr. Livingston.

The allegation of the increased value of property is not supported by evidence. The bill filed by the widow of Fort is no part of the case. But whatever may be the present value of the property, it can have no influence in the cause.

Suppose the property was now worth one-half of what it was in 1823, could the respondent apply to the district court of Louisiana, and after making a sale at auction, claim from the legal representatives of Mr. Livingston the deficiency? This right should be found in the proceedings in favour of the defendant; or it cannot exist in favour of the representatives of Mr. Livingston.

[Livingston v. Story.]

Mr. Clay, also of counsel for the appellee.

This case stands before the Court under no favourable appearances. A transaction closed in 1823; finally closed; without an expression of dissatisfaction; and in harmony with the written agreements between the parties: is brought up ten years afterwards, and a claim is made to put aside all that was then considered completed. Mr. Livingston was in Louisiana for many years after 1823, in New Orleans; and no suit was instituted by him to avoid what he had done, and no complaint made by him. The situation of Mr. Livingston, his profound legal knowledge, and his professional experience, gave him every opportunity of knowing the import and effect of the instruments executed by the parties. On the other hand, the purchasers of the property were ignorant of the law, were merchants, not knowing the effect of these instruments. They took them to be what they imported; and trusted to them upon the plain construction of their terms.

The first question in the case is, by what law is it to be tried?

The case shows the high and august character of this Court. Accustomed to the rules of the common law, and to the principles and practice adopted in courts of equity; they are called upon, from a distant state, to expound laws different from those which their deep studies have made familiar to them; and a knowledge of which, and their eminence as jurists, learned in the common law, and the law of equity, have given them the high positions they hold.

The effect of the decree in this case, when it was formerly before the Court, was no more than to give to the district court of the eastern district of Louisiana chancery jurisdiction over the cause. The plan of the constitution of the United States, was not to create or apply any laws in the states of the Union in the courts of the United States, in cases brought before those courts, other than the established laws of the state; but to give a right to administer those laws in the cases legally brought before those courts. In cases brought from any state to this Court, the only power the Court has is to apply the laws of the state; and in this case the law of Louisiana will be applied. It is essential to secure confidence in the Court, that this shall always be done.

In looking at this case, under the laws of Louisiana, the Court will find that there are no laws which impose penalties on usury; and although the civil code declares the rate of interest in certain

cases, and in particular contracts; it does no more. These provisions will not be filled up by penalties.

It was, in the district court of Louisiana, presented on new pleading, and the facts as exhibited in the defendant's answers, in the contracts between the parties, and on the oral evidence, are now, for the first time, to be considered by this Court.

The question of jurisdiction, from the citizenship of the parties, was brought before that Court, and the evidence does not show that the complainant, when the bill was filed, was a citizen of any other state than Louisiana. This Court will now consider this question. If, according to the strict rules of pleading, under the common law, and the practice of courts of chancery, a plea in abatement should have been filed, this is not required by the civil law, and it will not be now insisted upon. A suggestion of a want of jurisdiction is always in time; and even if the principles applied in chancery cases, shall govern in the final decision of this cause, the practice of the courts of the United States, in Louisiana, are by the acts of congress, to be conformable to the rules of practice in the state courts.

As to the merits of the case, all the allegations of the great value of the property, are without any evidence to support them. If at the time of the transaction, the property was of greater value than the sum the defendant and Fort agreed to pay for it, this could have been, and should have been proved. No testimony was offered on this subject; and the conclusion is, that such was not the fact. If afterwards it became of greater value, it did so in consequence of the improvements made upon it by the purchasers, by the expenditure of their capital upon it; and by the rise of property in value from the great prosperity of the city of New Orleans.

But if the value of the estate is to be determined by this Court, and is essential to the disposition of the case; the Court have evidence before them, which entirely contradicts all the assertions of the appellant. The accounts rendered by the appellee, show that no proceeds of the property, which will justify or sustain the allegations of such value, have come into his hands. This is the best testimony which the case admits of; and the appellant has not attempted to contradict the statements in these accounts.

The liberty of purchasing property, and the privilege of disposing of it, are among the highest we enjoy. May they not be exer-

cised in the manner which those who acquire or will dispose of property think proper, and on such terms as may be agreed upon? May not a loan of money on property to-day, be converted into a sale to-morrow for the money borrowed? Nothing in the laws of Louisiana to prevent this has been shown, and no such provisions exist. While courts may have looked into transactions of this kind with a jealous scrutiny, to prevent usury; they have not claimed the powers to make void an absolute sale, made by a person fully competent to act, and who deliberately acted in making the sale; and this where no evidence has been offered to show that the full value of the property sold was not paid. The whole argument of the appellant assumes that the transaction was that of a loan; and this in direct opposition to the other evidence in the case. It assumes that it was a loan on the property by Fort and Story; and being such, the law of Louisiana deprived the borrower of the right to change the transaction, and make it a sale. To support this position, the law prevailing in Louisiana has been referred to without success.

Mr. White, in reply, insisted that there was evidence in the case which fully proved that Mr. Livingston was, when the bill was filed, a citizen of the state of New York. He became a citizen of that state; when he ceased to be a senator from the state of Louisiana; and his residence in the District of Columbia, while acting as secretary of state, did not affect, or impair his New York citizenship. He asked, if an exception to the jurisdiction of this Court, on the allegation that the appellant could not sue in the district court of the United States of Louisiana, could be admitted; when it did not appear, that the question of citizenship had been made before the judge of that court?

As to the operation of the act of limitation, no such point was made in the court below. If it had been presented, the law of Louisiana would not have sustained it. Cited, Civil Code, art. 1082, 1084, art. 67, page 436; Title Prescription. In 3 Martin's Rep. 458, the law on this subject is found. Prescription does not apply to pledges, and is always interrupted by judicial proceedings; and it does not run until twenty years. Cited, as to Prescription, or Action of Nullity, Civil Code, 722, 1084.

The argument for the appellant has been mistaken by the counsel for the defendant. It has not been said that this is the case of a mort-

gage. Possession of the property mortgaged, does not expressly, nor does it ever in Louisiana pass with the execution of the instrument. This was not then a mortgage. Was it an absolute sale? The demand of the money at the several succeeding periods when it became payable, and the protests at each period, even at the last, when by the surrender of the counter-letter, and the new agreement, the transaction had assumed a new aspect; show that it was always considered and treated as a loan.

The only right Fort and Story acquired by the last agreement, was the right to procure from a competent court a decree of sale; this decree they could not legally obtain, until the complainant was legally put in default, by the sentence of a court.

The complainant was never put in legal default; no legal demand was made; no sale ordered. The property remains the property of Livingston in pledge.

The contract was usurious by the law of Louisiana. Interest on a judicial proceeding is five per cent.; bank interest is six per cent.; and conventional interest may be ten per cent. No one can recover on a contract, where the interest exceeds ten per cent. In this case the contract being usurious, was tainted and corrupted throughout. The transaction not being one of mortgage, not being a conditional sale, or an absolute sale, after the surrender of the counter-letter, what is it? This is shown in the laws of Louisiana.

Under that law, as under the civil law, the security is one of the highest order, and one under the peculiar guardianship of the law. The contract being made, is to be carried out according to its original terms, and no other. If the amount loaned is not repaid, the lender must adopt the course which was originally agreed upon; and which he stipulated to pursue. He can only sell the property by a judicial sale; and from the sale receive the sum due to him. This is called an antichresis by the civil code; and all its characteristics and its incidents are well defined, established, and declared. Cited, art. 974, 984, Civil Code.

The nature of the antichresis is, that the lender has the property in his possession, and receives the profits. These go towards paying all expenses to which he may be subjected, and discharging the interest on the loan. The rule of the civil law, both in Louisiana, and wherever it prevails, is, once a pledge, always a pledge. Cases have existed, and the rules of the law have been applied to them, in which

as many as one hundred years have elapsed since the transaction was commenced. 13 Seirey, 223.

The stipulation which was afterwards entered into, that the title to the pledge should become absolute, and become a title in fee simple, was void and null by the civil code; and by the decisions of the courts of Louisiana. Civil Code of 1808, art. 25, tit. Pledge; Code Napoleon, art. 20, 88. It is here said, the creditor cannot sell the immovable property pledged, in default of payment, or by the consent of the contracting party.

The code of Louisiana is borrowed from this article. Under this article, the French courts have proceeded, and have held that a creditor cannot sell the pledged article with the consent of the debtor. 12 Seirey, 20; 13 Seirey, 233; 7 Seirey, 872. Cited 1 Martin's Rep., New Series, 417; 2 Ibid. 22, 24, 17; 3 Ibid. 17, 168; Potheir on Pledges; Potheir on Mortgages, chap. 4, tit. Security.

The Court will apply the law, which is thus established, to the case before them. The appellant asks a restoration of the property on the restoration of the sum loaned, and the interest, including all costs and expenses. This is reasonable. It has been shown that this may be, and has been done after one hundred years; and in the case before the Court, little beyond ten years had passed, before the claim, which is now before the Court, was made. By the decree which the Court are asked to give, the defendant will sustain no injustice. The appellant, as was said in the argument in chief, does not place the claim on the law of usury. He asks, that all the interest he agreed to pay, shall be allowed to the defendant; and this being allowed, and all the capital advanced repaid, the property, is asked for; or that a sale of the same shall be made, and the residue of the proceeds paid over, after all that the defendant is entitled to shall have been fully reimbursed to him.

Mr. Justice WAYNE delivered the opinion of the Court.

The legal question to be decided in this case, depends altogether upon the facts disclosed in the bill, answers, and documentary evidence on the record.

The complainant charges, that some time previous to the 25th July, 1822, being in want of money, he applied to the defendant, and John A. Fort, for a loan, offering as security, a lot on the batture of the suburb St. Mary, between Common and Gravier streets, in New Orleans, on which a building intended for stores, had been

begun; that the defendant and Fort, had agreed to lend him twenty-two thousand nine hundred and thirty-six dollars, of which a part only, was paid in cash, part in a note of John A. Fort, and eight thousand dollars of which, was, afterwards, agreed between himself, the defendant, and Fort, to be paid by Story and Fort, to one John Rust, a mechanic; who had contracted with complainant, to complete the stores; that to secure the payment of the money borrowed, complainant conveyed to Fort and Story the lot of ground mentioned; and that contemporaneously with the deed of sale, they executed on their part, an instrument in writing, called *a counter-letter*, by which they promised, on the payment of twenty-five thousand dollars, on or before the 1st day of February, 1823, to reconvey to the complainant the property which he had conveyed to them. The complainant further charges, that of the sum of twenty-five thousand dollars, to be paid by him on the 1st of February a part of it was made up by a charge of interest, at 18 per cent. per annum upon the amount of twenty-two thousand nine hundred and thirty-six dollars, actually advanced to him, and on his account to Rust, by Fort and Story. The complainant also transferred his written contract with Rust, to the defendant and Fort, rendering himself responsible for the proper employment of the eight thousand dollars by Rust, and which was to be paid Rust in weekly payments, by the defendant and Fort. Rust, on his part, consented to the transfer of his contract, and accepts Fort and Story in the place of complainant. The stores were to be completed by Rust, by the first of November, 1822, in a workmanlike manner, and all the materials, except those already provided, were to be found by Rust; and in his contract, he renounces all claim or privilege upon the building, beyond the eight thousand dollars which was to be paid him by Fort and Story, for the complainant. For the deed of sale from Livingston to Fort and Story—the counter-letter to Livingston—Rust's contract, and the transfer of it—all of the same date, see documents, A B, C, ante, page 354. The complainant further charges, that soon after the transaction, he left New Orleans, and that when he returned to it, he found that Fort and Story had paid to Rust eight thousand dollars on his account; but that little or nothing had been done towards the completion of the stores; so that if the property had been sold on the 1st of February, according to the terms of the counter-letter, it would not have produced any thing like its full value. That under these circumstances, he applied to Fort and Story for further time to make the

[Livingston v. Story.]

payment of the sum loaned, which they would not consent to, but on the following conditions: that the property should be advertised for sale on the 2d of June, 1823; that the sum due them should be increased from twenty-five thousand dollars to twenty-seven thousand five hundred dollars; which was so increased, by the addition of fifteen hundred dollars as interest, at eighteen per cent. for four months, eight hundred dollars for auctioneers' commissions, fifty dollars for advertising, and one hundred and fifty dollars, arbitrarily added by the said Fort and Story. The complainant states, that being entirely at the mercy of Fort and Story, he consented to those terms, and executed a paper accordingly; ante, page 356. On the 2d June, the complainant being still unable to repay the actual sum advanced to him, and the additions made by the charge of interest at eighteen per cent. &c. &c., he applied to Fort and Story for a further extension of the time of sale, which they consented to for two months longer, to the 5th of August, by which his debt to them was augmented to twenty-seven thousand eight hundred and thirty dollars seventy-six cents; he agreeing in writing, that if, on the last mentioned day, he should fail to pay twenty-seven thousand eight hundred dollars, seventy-six cents, then the lot and all the buildings thereon were to become the full and absolute property of Fort and Story; ante, page 356. The day came, and the complainant did not pay. The defendant had him protested, as he had before done on the 4th of February, for his noncompliance with his agreement to pay the sum of twenty-five thousand dollars: and on that of the 5th of August, for his noncompliance with his agreement to pay twenty-seven thousand eight hundred and thirty dollars, seventy-six cents; and for all damages, costs and charges, and interest, suffered or to be suffered by the said Fort and Story. The defendant and Fort after this, continued in possession of the lot and buildings, until the death of Fort, which took place in 1828; and after the death of Fort, the defendant Story retained or took possession of the property by an arrangement with the heirs of Fort. It is to be remembered that the possession of the property was given by Livingston to Fort and Story, on the 22d of July, 1822, when the deed of sale and counter-letter were executed.

Here it is proper, for a full understanding of the transaction between these parties, to set out, what were the rights of Livingston, and obligations of Fort and Story to Livingston, growing out of the counter-letter, and continued by them on the subsequent agreement,

until that of the 2d of June; when it was stipulated by Livingston, that if he failed to pay on the 5th of August, the property was to become absolute in them.

The counter-letter, after reciting that Livingston had sold and conveyed to them the lot, buildings and improvements, for the sum of twenty-five thousand dollars in cash, declares it to be the true intent and meaning of the parties to said deed of sale, that if Livingston shall pay and reimburse to Fort and Story, twenty-five thousand dollars, on or before the 1st of February, 1823, then Fort and Story stipulate and bind themselves to reconvey the property to Livingston. And in case of nonpayment, at the stipulated time, then Fort and Story "*covenant and agree to cause the said property to be sold at public auction, by one of the licensed auctioneers of this city, after twenty days' public notice, on the following terms, to wit, twenty-five thousand dollars in cash, and the residue in equal payments, at one and two years; the purchasers giving satisfactory endorsed notes, and special mortgage on the property until final payment. The residue, after deducting the costs attending the sale, to be delivered over to the said Edward Livingston.*

When the first extension of the time of payment was given, we find, substantially, the clause of the kind just recited. It will be well to give it in terms.

Agreement between Edward Livingston and John A. Fort and Benjamin Story:

1st. The sale of lot No. 1, on the batture, with the buildings thereon, to be postponed until the 2d of June next

2d. On that day it shall be sold by M'Coy & Co., unless sooner redeemed, after being advertised in the Courier de la Louisiane, in French, and the Orleans Gazette, in English, from the 1st day of May previous to sale.

3d. *The conditions of the sale shall be 27,350 dollars cash, and the residue at one and two years, with special mortgage: but in this sum is included 850 dollars, at which the auctioneers' commission and charges of advertisement are calculated, which are to be deducted or reduced to what they shall really amount to, if payment be made before the 1st of June.*

4th. *The overplus, after deducting the cash payment, is to be delivered to Edward Livingston.*

5th. *The counter-letter, executed by Messrs. Fort and Story,*

[Livingston v. Story.]

*shall be delivered up, and the registry thereof annulled immedi-*
*ately after the signature* of this agreement, made by duplicate, &c.

The defendant begins his answer by denying the right of the complainant to sue in the district court of the United States for the eastern district of Louisiana, on account of both being citizens of the same state; equivalent to a denial of the jurisdiction of the court over the case.

He then denies, positively and repeatedly, that Fort and himself, either jointly or separately, ever agreed to lend the complainant 22,936 dollars. So far from any loan having been intended by the parties, he says, the negotiation for the sale of the lots began between Fort and Nathan Morse, (the latter of whom he states as having acted for the complainant;) and that one of them informed him that the complainant wished to raise money on mortgage; that he peremptorily refused to advance any money to the complainant on mortgage. That this refusal was afterwards made by him to the defendant himself; and for a confirmation of his refusal and understanding of the parties, he refers to two notes of Morse, as a part of his answer, both of them addressed to Fort; the first dated the 13th of July, and the other on the day the conveyance of the lot was made to himself and Fort, by Livingston. Ante, page 360. He then states the sale of the lot to himself and Fort; refers to the deed of sale; and, generally, declares himself and Fort have paid more than the price agreed on for the property so purchased. He then admits the execution, by himself and Fort, on the day of the sale, of an instrument in writing; giving to Livingston the power to redeem; whereby, upon the payment of 25,000 dollars, on or before the 1st of February, they were to reconvey the property to Livingston; and if he fail'd to pay, that Fort and Story were to sell the property so acquired and purchased, and if it brought more than 25,000 dollars, that they would give the surplus to the complainant. The answer then contains the failure of Livingston to pay; the extension of time to him by another agreement, to the 2d of June, on which they agreed to postpone the sale; and that Livingston was to give them a compensation for the additional chance which the time allowed gave him to repurchase the lot. Upon this agreement the defendant relies to prove an absolute bill of sale of the property to himself and Fort at the time of its execution; because the fifth and last clause of it annulled the counter-letter. The defendant recites the second failure of Livingston to pay; the fur-

ther extension of time to him to the 5th of August, and Living-
ston's stipulation, ante, page 356, by which, on Livingston's failure to
pay 27,830 dollars 76 cents, and any further sum that Fort and Story
may be under the necessity of paying for the care and preservation
of the property; the lot and buildings were to become the full and
absolute property of Fort and Story; and Livingston's obligation to
*surrender and cancel all and every writing or other document in
relation to the property, that may give him any equity of re-
demption, or other right in the premises; it being the true intent
and meaning of the parties, that in case of failure of payment,
that the lot and buildings, and appurtenances, are to vest in Fort
and Story a full title in fee simple, forever.* The defendant in-
sists that Livingston was the guarantee of Rust, for the application
of the 8000 dollars to the completion of the buildings. He then
relies upon the ninety-third and ninety-fourth articles of the Civil
Code of Louisiana, then in force in the state; to give himself and
Fort an absolute and irrevocable title to the property, on Living-
ston's failure to pay on the 5th of August. The articles relied on
are: "The time fixed for redemption must be rigorously adhered to,
it cannot be prolonged by the judge;" and *"if that right has not
been exercised within the time agreed on by the vendor, he cannot
exercise it afterwards; and the purchaser becomes irrevocably pos-
sessor of the thing sold."* He reiterates his denial of any loan, or
that time was given to Livingston to repay a loan: but that the ex-
tension of time was to enable Livingston to repurchase, or to effect
the sale of the property; and that the increase of the sum from
25,000 dollars to 27,830 dollars 76 cents, was the sum demanded by
them as the consideration of their waiver of their right to have the
sale made at the time the money was payable. The defendant de-
nies the deduction of interest at eighteen per cent. per annum, or
any other.

To the second interrogatory in the bill, he answers, that, at the
time of the purchase, he paid Livingston in a check on the United
States Bank, twelve thousand and six dollars fifty-seven cents, in a
note of John A. Fort, in favour of defendant, due and paid November
25th, 1822, two thousand seven hundred and sixty-four dollars
eighty-three cents; and to Nathan Morse, Esquire, the attorney of
Edward Livingston, one thousand dollars; which sum, *Morse stated
to Story, he considered ought to have been paid him by Living-
ston, for effecting a sale of the property.* To the fourth interroga-

tory; which is, if Fort and Story did not consent to postpone the sale of the property to the second of June, and did not exact, as a condition of such postponement, that the counter-letter should be cancelled, and that the complainant should pay the sum of two thousand five hundred dollars, in addition to the twenty-five thousand dollars: and whether the sum of two thousand five hundred dollars was not made up of interest, charged for four months, at 18 per cent. per annum, of eight hundred dollars auctioneers' commission, fifty dollars for advertising, and an arbitrary sum of one hundred and fifty dollars, the defendant answers, that Fort and himself did consent to postpone the sale; but that he does not know, except from the act, how the additional sum stipulated to be paid by them was composed; nor does he recollect any memorandum containing the items of the additional sum.

In an exhibit by the defendant, we, however, have a more precise statement of the sum paid to Livingston.

July 26th, 1822, cash paid E. L.        -        -        $12,006 57
   27th   "   J. A. Fort's note, payable
                  25th Nov.        -        -        -        2,764 83
Sept. 10th, cash paid John Rust at sundry
                  times        -        -        -        -        8,000 00
Interest        -        -        -        -        -        -        2,228 60—$25,000

Thus, substantially confirming the allegation of the complainant, that the sum of twenty-five thousand dollars expressed on the deed of sale, as the consideration for the purchase, was made up in part of an amount of interest upon that sum, deducted by Fort and Story, contemporaneously with the execution of the deed of sale, and counter-letter.    There is this difference too between the answer of the defendant and the exhibit, that it appears, from the latter, the sum of one thousand dollars paid to Morse, which the defendant, in his answer, alleges to have been paid by him as a part of the consideration for the lot, or on account of Livingston; was not paid to Morse until the 12th of February, 1824; more than six months after the time when the defendant considered himself and Fort, to have acquired a full and absolute title to the property, from the failure of Livingston to pay on the 5th of August preceding.    Upon this item of money paid to Morse, we remark, that the letters of Morse, ante, page 360, do not prove Morse to have been the agent of Livingston in negotiating the transaction between the parties; but rather that he was, if not altogether the agent of Fort and Story, the agent of both

the parties: and that the defendant, without consulting Livingston, graduated the compensation of Morse by his own ideas of the service rendered by him; and chose to pay Morse one thousand dollars, after he considered Livingston had forfeited his right to redeem the property. The answer and exhibit are contradictory upon this point; but the latter being more detailed and certain, it forces the conclusion to which we have come as regards that item. We must remark, too, that the answer and exhibit are also contradictory in a more essential particular, as regards the interest alleged to have been deducted from the twenty-five thousand dollars, at the time the deed of sale was executed; the exhibit stating the fact of interest being then deducted, and the answer denying that 18 *per cent. interest was deducted, or any other.*

Soon after the transaction of the 25th of July, 1822, the complainant left New Orleans, and did not return to it until after the time within which Rust was to have had the buildings completed. They were not finished, however; and this incident deserves a passing notice. The defendant and Fort had required an assignment of Rust's contract to them; indeed it is of the same date with the deed of sale and counter-letter, and seems to hav · been made by Livingston and Rust for them. It was transferred with Rust's consent, they undertaking to make weekly payments to him of 666 dollars during the progress of the work, to the amount of 8000 dollars; and Livingston rendering himself responsible for the proper employment of the money by Rust. In a short time, however, the defendant admits that he discovered Rust misapplying the money to some other contract; and that, upon remonstrating with him against such conduct, Rust persisted in a declaration of his intention to expend the money otherwise than in the execution of his contract. Under these circumstances, what should the defendant and Fort have done? We think, good faith with Livingston, as they had made themselves his agent to disburse 8000 dollars for a particular object, to which they had become parties by the transfer of the contract, required from them in Livingston's absence, to have stopped further payments to Rust, notwithstanding Livingston's responsibility for the proper employment of the money: for Rust's obligation to them under the transferred contract, was to have the stores finished by the 1st of November; and as they held the funds to be applied to that object, they should have withheld them from Rust, when he declared his intention not to do so, and had ceased to work upon the

[Livingston v. Story.]

buildings. Rust's conduct was as much a breach of his contract with them as it was with Livingston; and they should have protected themselves and Livingston, which they could easily have done. Instead of this being done, the defendant admits he continued the weekly payments to Rust after he had discovered the misapplication of the money; and that but one thousand dollars of the eight thousand dollars were applied to the buildings. They neither protected themselves, nor Livingston: and it cannot be disguised that the misapplication of the money was much more fatal to Livingston than themselves; for the buildings being unfinished in November, Livingston was deprived of any further resources from them to aid him in redeeming the property on the 1st of February, by paying the money advanced by them. This incident gave Livingston a strong claim upon the defendant for an extension of time; and we cannot but remark, that it has a bearing in favour of the allegation of the complainant, that by the contract of July, 1825, an absolute sale was not intended. Is it reasonable to suppose that the defendant and Fort, if an absolute sale had been intended, would have calmly seen the misapplication of eight thousand dollars from what they deem their property, and taken Livingston as a security, upon his general responsibility for Rust; when the defendant himself declares he would not have loaned Livingston money on any account? The consequence of this misapplication of seven thousand dollars by Rust, was to take so much from Livingston's ability to redeem the property. The complainant, however, does not pray to be discharged from this sum, on a settlement of the transaction with the defendant; and, therefore, the payment to Rust, of eight thousand dollars, must be allowed to be a charge against Livingston.

We do not deem it necessary to make a further synopsis of the bill and answer.

They are contradictory in several points: but a careful examination of them, and of the documents and exhibits attached to the answer, has enabled us to fix the legal character of the transaction, throughout, under the laws of Louisiana; whatever may have been the designs of the parties upon each other, or their individual intentions, when the contract was made, on the 25th of July, 1822. The law of Louisiana controls the controversy between these parties: and the first, indeed, only question, to be determined, is, what was the legal character of the contract between them, from the execution of the first papers to the last, on the 2d of June, 1823?

The defendant's counsel do not contend that it was an abso-
lute sale. The defendant's answer shows it was not. He admits
Livingston's power to redeem, and their obligation to reconvey, as
expressed in the counter-letter. For although the conveyance of
the 25th of July, 1822, is, in form, a positive sale, yet, the counter-
letter explains its nature as fully as if it were inserted in that con-
veyance. Executed, as it was at the same time, it is a part of the
contract; a separate clause, modifying and explaining the other
clause, states the deed of sale. The two must be construed together.
The Civil Code of Louisiana says, " all clauses of agreements are
interpreted the one by the other, giving to each the sense which
results from the entire act;" Civil Code, 1808, p. 270, sec. 5, art 61.
It can make no difference whether these clauses be on one piece
of paper, or on two pieces; whether there be two separate instru-
ments, or one instrument containing the substance of the two. The
Civil Code of Louisiana does not require that the stipulation of par-
ties, relative to a sale of property, should be in one instrument.
They are to be reduced to writing, and the parts necessarily make
up the entire contract; in this regard, corresponding with the sale
in equity, which makes a defeasance attach itself to a conveyance,
absolute in the first instance, converting the latter into a mortgage,
as it is expressed by chancellor Kent, in Com. 4 Vol. p. 135, treat-
ing of mortgages. " The condition upon which the land is con-
veyed is usually inserted in the deed of conveyance, but the de-
feasance may be contained in a separate instrument; and if the deed
be absolute in the first instance, and the defeasance be executed
subsequently, it will relate back to the date of the principal deed, and
connect itself with it, so as to render it a security, in the nature of a
mortgage."

We do not mean to be understood as applying this rule to make,
under the laws of Louisiana, a constructive mortgage out of an abso-
lute conveyance or deed of sale, on account of some other paper ex-
plaining or controlling the first; but have used it only as an illustra-
tion, that by the law of Louisiana, a contract of sale, and a power t
redeem, need not be in one instrument.

The contract of the 25th of July, 1822, not being an absolute sale
then, what is it? It is either a conditional sale, vente a rémeré, (sale
with the right of redemption,) a mortgage, or a pledge. The de-
fendant's counsel say it is the first, a conditional sale, vente a rémeré.
We will use their language. They say it is a contract of sale, not a

[Livingston v. Story.]

pure and simple sale, but a sale with conditions, and a right or power of redemption annexed, vente a rémére; that the right and power of redemption stipulated for in this case, is in exact conformity with the provisions of the same code of 1808, in form and substance, and identifies it still further as a sale, vente a rémére. That is defined to be "an agreement or paction, by which the vendor reserves to himself the power of taking back the thing sold, by returning the price paid for it;" Civil Code, 245; and the provision of the code regulating the right of redemption, or that "the time fixed for redemption must be rigorously adhered to, it cannot be prolonged by the judge;" and "if that right has not been exercised within the time agreed on by the vendor, he cannot exercise it afterwards, and *the purchaser becomes irrevocably possessed of the thing sold;*" just as at common law and in equity, in the case of an absolute sale with an agreement for a repurchase, the time limited for the repurchase must be precisely observed, or the vendor's right to reclaim his property will be lost. 1 Poth. on Sale, 183; 1 Vesey, 405.

But in this instance there was no sale corresponding to the vente a rémére, unless other provisions in the counter-letter than Livingston's right to redeem, shall be altogether disregarded. By the counter-letter, Fort and Story covenant with Livingston upon his failure to pay, that the property shall be sold at auction, and that the residue of what it might bring over the sum which they claimed, should be paid to Livingston. Upon failure to pay, the land and buildings did not become the property of Fort and Story. The failure to pay only gave to them the right to have it sold; according to the terms prescribed, for their own reimbursement. Had the contract been a vente a rémére, the land would have become their absolute property; for the code is, "if the right to redeem has not been exercised within the time agreed on by the vendor, he cannot exercise it afterwards, and the purchaser *becomes irrevocably possessed of the thing sold.*"

The exclusion of that irrevocable possession by Fort and Story in the counter-letter, upon Livingston's failure to pay, destroys so principal and effective a provision of the vente a rémére, that the law will not permit us to consider the contract to have been one of that kind.

The question then recurs, what was the nature of the contract of the 25th July, 1822? It is not a mortgage, because no property on the soil, nor right of possession, is given by the contract of mort-

gage by the law of Louisiana. By that law, a mortgage is defined to be "a contract, by which a person affects the whole of his property, or only some part of it, in favour of another, for security of an engagement; but without divesting himself of the possession thereof." In this instance possession accompanied the execution of the deed, and has continued in the defendant. It was a part of the contract, and a feature of it entirely inconsistent with a mortgage under the laws of Louisiana. The contract then, being neither a sale upon condition with a power to redeem annexed, a vente a rémére; we must seek further in the laws of Louisiana, to establish its legal character. After much inquiry and deliberation, and a comparison of the Civil Code of Louisiana with the civil law from which the former derives its origin, and with which it is still in close connection; we have come to the conclusion, that the original contract and counter-letter constituted a pledge of real property; a kind of contract, especially provided for by the laws of Louisiana, denominated "an antichresis." By this kind of contract, the possession of the property is transferred to the person advancing the money. That was done in this case. In case of failure to pay, the property is to be sold by judicial sentence; and the sum which it may bring over the amount for which it was pledged, is to be paid to the person making the pledge. In this case, a provision was made for a sale by the parties upon the failure of payment; but this feature of the contract is rather confirmatory of the contract and counter-letter, being an antichresis, than otherwise; for it is, at most, only a substitution by the parties of what the laws of Louisiana requires; and what we think the law requires to be done by itself, through the functionaries who are appointed to administer the law. But upon this point, let the law speak for itself. The Civil Code of Louisiana says, "the pledge is a contract, by which the debtor gives something to his creditor as a security for his debt." Tit. 20, art. 3100.

"There are two kinds of pledges; the pawn, and antichresis."

"A thing is said to be pawned, when a movable thing is given as security. The antichresis is, when the security given consists in immovables." Tit. 20, art. 3102.

"The antichresis shall be reduced to writing. The creditor acquires by this contract, the right of reaping the fruits or other revenues of the immovables to him given in pledge, on condition of deducting annually their proceeds from the interest, if any be due to him, and afterwards from the principal of his debt." Art. 3143.

[Livingston v. Story.]

"The creditor is bound, unless the contrary is agreed on, to pay the taxes as well as the annual charges of the property given to him in pledge. He is likewise bound under the penalty of damages to provide for the keeping, and useful, and necessary repairs of the pledged estate, and may levy out of the revenues of the estate sufficient for such expense." Art. 3144.

"The creditor does not become proprietor of the pledged immovables by failure of the payment at the stated time: *any clause to the contrary is null:* and in this case it is only lawful for him to sue his debtor before the court, in order to obtain a sentence against him, and to cause the objects which have been put in his hands to ibe sezed and sold." Art. 3146.

"The debtor cannot, before the full payment of the debt, claim the enjoyment of the immovables which he has given in pledge. But the creditor, who wishes to free himself from the obligations mentioned in the preceding articles, may always, unless he has renounced this right, compel the debtor to retake the enjoyment of his immovables. Art. 3145. These appear to us to be equitable provisions, affording ample security to the creditor, and fully protecting the rights of the debtor. Especially protecting the latter from a rapacious creditor, who might otherwise push his debtor's necessities into a relinquishment of all his rights in such a contract; to make himself the proprietor of the thing pledged, upon the failure of the debtor to pay. This is a high species of security, over which the law watches benignantly; because, though one of choice and convenience, very frequently; it is commonly the resort of distress in the last alternative, when all other means of raising money have failed. It was this high species of security, that Fort and Story received from Livingston; or their contract cannot be comprehended within any of the provisions of the Civil Code of Louisiana. If any thing else, it is a contract unknown to the laws of that state. We class it with the antichresis: not because the instrument between the parties provides specifically in every particular for the rights and obligations of parties to the antichresis; but because it does so, in the main and substantial requisites of such a contract, and from those main and substantial particulars in this contract, being irreducible to any other kind of contract provided for by the laws of Louisiana. The property was put into the possession of Fort and Story; they looked to it to reimburse them upon the failure of Livingston to pay; upon that failure it did not, from the terms of the counter-letter, become

theirs absolutely; as we see would have been the case if it had been a vente a rémèré. It was to be sold at public auction; and if a sale should be made for more than they had advanced, the residue was to be paid to Livingston. But no such sale could be made without a judicial sentence; such a decree was not obtained; no sale was made; so the parties stood under the contract on the 1st of February, when Livingston first failed to pay, as they did when it was first entered into. It is therefore plain, that Fort and Story acquired no absolute property in the lot and buildings, under the contract of the 25th of July, 1822; and if they did not, it was only a pledge or antichresis for their ultimate reimbursement.

We now proceed to inquire whether the antichresis was converted into a sale, by the annulment of the counter-letter after the 1st of February, 1823, under the agreement of the 4th of March. It appears by the document, ante, page 356, that the complainant did, on the last mentioned day, execute a paper annulling the counter-letter of the 25th July. But supposing the first to have been so annulled; was not the second in effect and in terms, another instrument of the same kind, only extending the time for redemption upon consideration of Livingston's paying a larger sum than the twenty-five thousand dollars originally expressed in the first deed of sale; and providing still for a sale in the event of Livingston failing to pay a second time, and giving to him the residue, if any should remain, after they were reimbursed. Consequently, until the 2d of June, the pledge continued. Livingston, under the agreement of the 4th March, could, by paying the money at any time on or before the 2d of June, have prevented the sale; and if a sale was made, he was entitled to the overplus.

The defendant, in his answer, says, that he and Fort agreed with Livingston to postpone the sale until the 2d of June, for which Livingston agreed to pay *them a compensation*, &c. &c.; that he had until the 2d of June to redeem, but did not do so; that then the property was to have been sold, &c. &c. Thus showing, that the property in his possession continued to be a pledge; and in case of Livingston's not paying, that a sale was to be made, notwithstanding the annulment of the counter-letter. But for what purpose was the counter-letter annulled? Clearly, because an increased sum was to be paid to Fort and Story by the second agreement; and not because it was the intention of the parties to alter, substantially, their respective rights in the property. The counter-letter, the agreement to sell at

a fixed day, and after reimbursing the defendant and Fort, to deliver the surplus proceeds of the sale to Livingston; the prolongen agree- ment to sell after annulling the first counter-letter, without any re- nunciation of Livingston's right to the overplus, as set forth in de- fendant's answer; prove conclusively, to us, that Story regarded the contract to be, what is really made by the law of Louisiana, a con- tract of pledge; a security for money advanced upon property. We think it was in its inception an antichresis; and that it continued so until the 2d of June, 1823. Did it after that time retain its original character?

The agreement of the 2d of June recites, " that it being the day fixed upon by the contract between Livingston, and Fort and Story, for the sale at auction of the lot, &c. &c.; and Livingston having requested that the sale might not take place for his own accommoda- tion; on condition that Fort and Story would assent to that request, Livingston agreed to increase the sum due to them to twenty-seven thousand eight hundred and thirty dollars, (which they deem the whole of the consideration money paid by them for said lot,) and to pay the same on the 5th of August, then next, and any further sum that they may be under the necessity of paying for the care or pre- servation of the property; in which case the property should revert to Livingston. But if he should fail to make such payment on the 5th of August, the said lot should become the absolute property of Fort and Story; it being declared to be the true intent of the parties, in case of failure of payment, that the said lot, with all the buildings thereon, are to vest in Fort and Story, a full, free and absolute title, in fee simple, for ever."

Such an instrument as this would have the effect to vest in Fort and Story an absolute title in the property, if it were not positively controlled by the law of Louisiana. We must administer the law as it is; and having established that the original transaction was an an- tichresis, and continued so up to the 2d of June, it was not in the power of the parties to give to it such a character, as to vest by the act of Livingston an absolute title in Fort and Story. " In the language of the Code, 1808, tit. Pledge, art. 28, already cited, the creditor does not become proprietor of the pledged immovables, by failure of payment at the stated time, *any clause to the contrary is null:*" "and in this case it is only lawful for him to sue his debtor, before the court, in order to obtain a sentence against him, and to cause the objects which have been put into his hands, in pledge, to be seized

and sold." If such a clause had been inserted in the original agreement, it would have been void. Can it be more valid, because subsequently introduced in a paper having a direct relation to the first contract; and which was intended to alter its character into something which the law prohibits, when it determines the original contract to be one of pledge? We think not. Such an allowance to a creditor would be a precedent, giving to all creditors in cases of pledges the power to defeat the benevolent vigilance of the law, preventing them from becoming proprietors of the debtor's property, unless by a decree of the court. We think it immaterial whether such covenant be in the original agreement, or in a subsequent instrument. In either case the law is express; the creditor does not become the proprietor by the failure of the debtor to pay; *any clause to the contrary is null.*

It would be difficult to find a case more clearly illustrating the wisdom of this rule, than that under our consideration. Story and Fort advanced to Livingston twenty-two thousand nine hundred and thirty-six dollars, and took possession of the lot; looking to Livingston, in the first instance, for reimbursement, and, on his failure to pay, to a sale of the lot. Livingston being unable to pay at the time fixed, applied for an extension of time; it is granted, but only upon condition of an addition of twenty-five hundred dollars to his debt, for a delay of four months: thus creating a debt of twenty-seven thousand five hundred dollars, in ten months, upon an advance of twenty-two thousand seven hundred and seventy-one dollars, forty cents. This increase, the exhibit attached to the defendant's answer proves was not on account of expenditures upon, or in the care of the property; for that account shows the disbursements of the defendant, in the care of the property, up to the 5th of August, 1823, did not amount to four hundred dollars. When the 2d of June came, Livingston was still unable to pay, and asked for a further extension of time; it was granted; but by another addition to the debt, or to the amount for which the property was already encumbered; and only upon condition that upon a third failure, the property was to vest absolute in Fort and Story. This final result is what the law of Louisiana intended to prevent in cases of pledge; and we know not a case to which it can be more fairly applied.

In the enforcement of the law, in this case, we are pleased to find authorities for doing so in the courts of Louisiana. We refer to the cases of Williams et al. v. Schooner St. Stephens, 1 Mart. Rep. N. S.

417; to the case of Syndics of Bermudez v. Hanez & Milne, 3 Mart. Rep. 17, and 168.

In regard to the plea of prescription urged in the defendant's answer, we think it inapplicable to a case of pledge; and if it be so, then that plea cannot prevail in this case, because the time had not elapsed, which the law of Louisiana gives to a person to sue for immovable property.

It now only remains for us to dispose of the defendant's protest, in the beginning of his answer, against the jurisdiction of the Court in this case. The 23d rule of this Court, for the regulation of equity practice in the circuit courts, has been relied on to show that it is competent for the defendant, instead of filing a formal demurrer, or plea, to insist on any special matter in his answer; and have the same benefit thereof as if he had pleaded the same matter, or had demurred to the bill. This rule is understood by us to apply to matters applicable to the merits, and not to mere pleas to the jurisdiction, and especially to those founded on any personal disability, or personal character of the party suing, or to any pleas merely in abatement. In this respect, it is merely affirmative of the general rule of the court of chancery; in which matters in abatement and to the jurisdiction, being preliminary in their nature, must be taken advantage of by plea; and cannot be taken advantage of in a general answer, which necessarily admits the right and capacity of the party to sue. 1 Sumner's Rep. 506, Wood v. Mann.

In this case, the judgment of the court below is reversed, and a decree will be entered accordingly.

Mr. Justice BALDWIN, dissenting.

When this case was before the Court at a former term, I dissented from the judgment then rendered, being of opinion that the case ought to be decided by the law of Louisiana, not the code of equity adopted from the English system into the jurisprudence of the United States, as the Court then decided.

As the civil law was admitted to have been in force in that province, before its cession to the United States, and remained afterwards the basis of the jurisprudence of the state, with only such modifications as were made by their local laws; I felt it to be the duty of this Court to administer it as it does the law of other states, "precisely as the state courts should do." 2 Pet. 656; 5 Pet. 400. It is admitted that in the code of the civil law, there is no discrimina-

tion between the law and equity jurisdiction of its courts, either in the principles, or mode of proceeding; the process and rules of judgment are the same, without regard to the nature of the right asserted, or the remedy sought. This contradistinction exists only in the jurisprudence of England, and the states which have adopted it; nor can it exist elsewhere, unless the common law prevails. The jurisdiction of courts of equity, separately from those of common law, is a necessary part of the common law; though the forms of proceeding are borrowed from the civil law, yet the principles and rules of decision are those of the law of England, by which the judge is as much bound as in a court of law. By the adoption of its forms, an English court of chancery no more adopts the civil law, as a code or system of jurisprudence, superseding the common law, than it does the decrees of the emperor in place of acts of parliament. Both systems remain as distinct, as if the modes of proceeding differed as much as the two systems; and though the civil law forms are better adapted to equity proceedings than those of the common law, there is another incompatibility between the two systems. The separation of cases in law from those in equity, is a necessary incident of the common law; one part of the system cannot be engrafted on the civil law without the other: of consequence the introduction of the equity part of the common law into a state which has adopted the civil law, necessarily displaces it; and introduces a system of jurisprudence wholly at variance therewith.

This conclusion is the result of the opinion and reasoning of the Court, which is applied to all *civil causes* in the courts of the United States, in that state: 9 Pet. 656, 7: for if the English system of equity is in force, because there is no court of equity; the whole common law is also in force, because there is no court of law, contradistinguished from equity; on this ground alone, my objections to the former decision were insuperable. By the third article of the Louisiana treaty, the inhabitants are guarantied " in the free enjoyment of their liberty, property, and the religion which they profess." 1 Laws U. 3 36. " That the perfect inviolability and security of property is amo g these rights, all will assert and maintain. 9 Pet. 133. " An article to secure this object, so deservedly held sacred in the view of policy, as well as of justice and humanity, is always required, and is never refused." 12 Wheat. 535; 6 Pet. 712; 8 Pet. 86, 8. " According to the established principles of the laws of nations, the laws of a conquered or ceded country, remain in force

till altered by the new sovereign." 9 Pet. 747. This principle was recognised by congress by the 11th section of the act of 1804, organizing the government of Louisiana; the 4th section of the act of 2d March; and the 9th section of the act of 3d March, 1805. " The laws in force in the said territory, at the commencement of this act, and not inconsistent with the provisions thereof, shall continue in force until altered, modified, or repealed by the legislature." 2 Story, 937, 964, 973. Congress extended none of the provisions of the judiciary or process acts to Louisiana; and instead of reserving to themselves the power of altering the local laws by those acts, expressly declared that power to be in the local legislature. These were solemn pledges, which the legislative power of the United States had never attempted to violate; or in my opinion could violate, without disregarding the faith of the treaty: to my mind a guaranty of property is inconsistent with the abrogation of the laws under which property is acquired, held and regulated, and the consequent substitution of a code, to which the people were utter strangers. Satisfied that if there could be a power to change the laws of a ceded country, it was in the legislative, and not the judicial department of the government; I considered these provisions of the acts of congress to be as imperative on this Court, as any other laws were, or could be.

A reference to the terms of the process act of 1792, will show that it could not apply to a state in which the civil law prevailed; for it directs the modes of proceeding " in suits at common law," and "in those of equity, and maritime, and admiralty jurisdiction, according to the rules" &c. which belong to courts of equity, and to courts of admiralty, as contradistinguished from courts of common law; 1 Story, 258. These terms necessarily exclude its application to a system, in which there was no such contradistinction; but in the act of 1824, the term is peculiarly appropriate to the law of Louisiana. "That the mode of proceeding in all civil causes, &c." 3 Story, 1971. The reason was obvious; there was but one mode of suing, whatever may be the cause of action. Congress thus declared, that the laws of the state regulating the practice of their courts, shall be the rule in the courts of the United States therein; so it had been for twenty years, and the state practice was confirmed, subject to such rules as the district judge might make. So it was construed and declared by this Court in 1830. " If no such rule had been adopted, the act of congress made the practice of the state the rule for the

Court of the United States.   Unless then, such a special rule existed, the Court was bound to follow the general enactment of congress on the subject, and *pursue the state practice.*"  3 Pet. 445.   Parsons v. Bedford, 3 Pet. 424, S. P; Parsons v. Armor et al.   In Duncan v. The United States, the Court, after reciting the act of 1824, are still more explicit.   " This section was a virtual repeal within the state of Louisiana, of all previous acts of congress which regulated the practice of the courts of the United States, and which come within its province.   It adopted the practice of the state courts of Louisiana, subject to such alterations as the district judge might deem necessary to conform to the organization of the district court, and avoid any discrepancy with the laws of the Union."  7 Pet. 450.   " As the act of 1824 adopted the practice of the state courts; before this Court could sanction a disregard of such practice it must appear that by an exercise of the power of the district court, or by some other means, the practice had been altered.   On a question of practice under the circumstances of the case, it would seem that the decision of the district court as above made, should be conclusive.   How can the practice of the Court be better known or established, than by its own solemn adjudication on the subject?"  Ib. 451, 2.

The act of 1828, is still more conclusive, when taken in connection with the decision of this Court on the process act of 1792.

" In order to understand the bearing which the instruction moved for, has upon the cause, it is necessary to remark, that the state of Ohio was not admitted into the Union till 1802; so that the process act, of 1792, which is expressly confined in its operation to the day of its passage, in adopting the practice of the state courts into the courts of the United States, could have no operation in that state. But the district court of the United States, established in the state in 1803, was vested with all the powers and jurisdiction of the district court of Kentucky, which exercised full circuit court jurisdiction, with power to create a practice for its own government."  1 Pet. 612.

This decision was made in 1828; and the same view was taken five years afterwards, in Duncan v. The United States.  " Nor did the act (of 1792) apply to those states which were subsequently admitted into the Union.   But this defect was removed by the act of the 19th of May, 1828, which placed all the courts of the United States on a footing in this respect, except such as are held in the state of Louisiana."  7 Pet. 451.

This act uses the same terms as the process act of 1792, in referring

to cases in law, equity, and admiralty; and so would not be applicable to Louisiana.   Congress, however, did not leave this matter open to any doubt; the fourth section is peremptory: " That nothing in this act contained, shall be construed to extend to any court of the United States, which is now established, or which may hereafter be established in the state of Louisiana." 8 Laws U. S. 63.

There is no phrase so potent as this, " *nothing in this act shall be so construed:*" it has not only the effect of an exception, a limitation or proviso; it is a positive and absolute prohibition against any construction by the judicial power, by which the thing prohibited shall be sanctioned.   The effect of these words in the 11th amendment of the constitution, has been adjudged by this Court to annul all jurisdiction over cases actually pending therein, past, present and future; though the constitution had expressly given jurisdiction in the very case. 3 Dall. 382, 3; 6 Wh. 405, 9.

" A denial of jurisdiction forbids all inquiry into the nature of the case." 9 Wh. 847.   " The constitution must be construed, as it would have been had the jurisdiction of the Court never been extended to it." 9 Wh. 858, S. P; 9 Wh. 206, 7, 16; 12 Wh. 438, 9.

No construction, therefore, can be put on the act of 1828 which will make it applicable to the practice of Louisiana; how, then, this Court could apply the act of 1792, in direct opposition to the subsequent acts of 1804, 1805, 1824 and 1828, was, and is, to me, a matter of most especial surprise.   The provisions of the acts of 1792 and 1828, so far as they refer to the rules &c., of courts of law and of equity jurisdiction, as contradistinguished from each other, are identical; it was, therefore, perfectly nugatory to exclude Louisiana from the operation of the act of 1828, and leave the act of 1792 in force within that state.   It was worse than idle; it was a solemn mockery, a legislative farce, a trifling with the people of that state, after a uniform course of legislation, for twenty-four years; on a subject upon which all people are peculiarly sensitive; their local laws, usages and customs.

Accustomed to the civil law, the first settlers of Louisiana, their descendants and emigrants thereto, cling to it, as we of the old states do, and our ancestors did cling to the common law, as a cherished inheritance.   Had congress declared in 1804, what this Court did in 1835; or had there been a fifth section to the act of 1828, enacting, that the process act of 1792, was in force in Louisiana, it may well be imagined, what would have been the state of public

[Livingston v. Story.]

opinion.    No such imputation rests on the legislative department as would be fastened on its faith, if in either their first or last act, in professing to maintain and protect the people in their property, according to the plighted. faith of the treaty of cession, had been to deprive them of their laws, and force a foreign system upon them. Nor for more than forty years after the act of 1792, and thirty years after the acquisition of Louisiana, had there been an intimation from this Court, that that act applied to the courts of the United States. within it, either as a territory or a state of the Union; the contrary had been declared and adjudged.

In 1828, it was decided that this act applied only to the states then composing the Union; 1 Pet. 612.    The declaration was repeated in 1833; 7 Pet. 451: and to leave no room for even discussion, this Court, at the same time held, that the act of 1824 was a virtual repeal of all previous acts of congress on the subject; 650. When this case came up, in 1835, it had been decided by this Court, that the act of 1792 never was in force in the new states, and that it was repealed as to Louisiana; the act of 1828, which applied to the other new states, was expressly prohibited from being applied to Louisiana; yet the act of 1792 was declared to be in force then.

If I am capable of comprehending this decision, it repeals five acts of congress; directly overrules three previous solemn decisions of the Court; revives an act which had been repealed; extends to Louisiana a law which never applied to any other new state; and overthrows every thing which carries with it legislative or judicial authority. As a precedent, it is of the most alarming tendency; no question, in my opinion, can be settled, if this was an open one in 1835.  Congress may legislate, and this Court adjudicate in vain; if the acts of the one, and the judgments of the other, are thus to be contemned.    My respect for both, forbids my assent to such a course, or my acquiescence in a principle which must absolve judges from their obligation to follow the established rules of their predecessors; in the construction of laws, and the settled course of the law.

Having entirely dissented from a rule laid down oy this Court in Green v. The Lessee of Neal, 6 Pet. 299; wherein the majority of the Court put and answer the question, " Would not a change in the construction of a law of the United States by this tribunal, be obligatory on the state courts?    The statute, as last expounded, would be the law of the Union; and why may not the same effect be given to the last exposition of a local law, by the state court?"

[Livingston v. Story.]

That the principle of "legis posteriores priores contrarias abrogant," is sound, when applied to legislative acts, all admit; but it is an innovation upon all rules, to apply it as a general rule to the exposition of statutes, which have received a settled construction by a court of the last resort. It is an assumption of legislative power, and a reversal of the established principle, that judges cannot amend or alter the law, but must declare what it is; and from the very nature of such a rule as is laid down in Green v. Neal, the law can never be settled, so as to be binding on the judges of this Court; as is most clearly illustrated in this case.

In 1835, there had been three solemn decisions, either of which was conclusive; that the act of 1792 was not in force in Louisiana; and there had been an uninterrupted course of practice in the district court of the United States, sanctioned by acts of congress and this Court, for more than thirty years. One judge only dissented in the case of Parsons v. Bedford; but it was because, in his opinion, the Court did not adhere, with sufficient strictness, to the state practice; 3 Pet. 452. In the cases in 1 Pet. 612, and 7 Pet. 450, the Court appear to have been unanimous; all the judges had then concurred in opinion on the very point which arose at the former argument; and the act of 1828, was a direct legislative sanction of the judgment of the Court in the former case, being adopted to cure the defect of the nonapplication of the act of 1792, to the new states. There were but five judges present, who took part in the former decision, two of whom dissented; so that the case was determined by only three judges. I do not mean to assert, that the effect of a judgment depends on the mere number of judges who concur in it; but I do assert, most distinctly, that such a decision does not settle the law, in opposition to *three* previous solemn and unanimous adjudications. If the question thus decided, remained open; there is, to my mind, neither reason, precedent, nor principle, to sanction the doctrine that any judge is bound by the *last* decision, when he is not bound by *former* ones. When *three* last decisions can be overruled, it is strange that *one* cannot be. The decision of 1833 was the last, before another was made. The act of 1792 was then declared to have been repealed, and never to have been in force in Louisiana; yet no respect was paid to it, or the one in 1830 or 1828; neither of them were thought deserving of even a passing notice, or the most remote reference to them. The act of 1828 was treated in the same manner, as alike unworthy of attention.

Had any other department or officer of the government, any circuit or district court of the United States, or any state court; thus drawn a sponge over these acts of congress, and our repeated decisions upon them; it would have been justly deemed a disregard of the constituted authorities.

I freely admit that a court may and ought to revise its opinions; when, on solemn and deliberate consideration, they are convinced of their error. It is often done, though never without the fullest investigation; even then, one decision does not settle the law; when they are contradictory, the matter is open for future research. There is no more certainty that a last opinion is more correct than the first. Generally speaking, a construction of a law nearest the time of its passage, is most respected; and is adhered to, though there may be doubts about it, on the principle of "stare decisis." But it is believed to be unprecedented, to consider a subsequent decision that omits any reference to prior ones, and from some cause overlooks them, though they are in point, and by a court of the last resort; as having settled the law. If, however, such is the rule, it necessarily follows, that it can only remain until another last decision shall be made, restoring the old law, or making a new version of it.

A judge who, in 1835, was at liberty to make a last construction of a law, is certainly as free in 1837, as he was two years before. The very principle of this case is, that prior decisions, though unanimous, are not binding; the next, in point of time, by a divided court, can then be of no more authority; and a fortiori, one such opinion cannot outweigh three contrary ones, unless every last decision has the same effect, whenever a present majority may think fit to make one. To such a principle I can never yield assent, unless in the last judgment of this Court, all prior ones have been fully considered; the more especially on such a subject as is involved in this case; in which we were called on to repudiate the laws of a state of this Union, and substitute therefor, by judicial power, a system equally repugnant to the habits, the customs, and the choice of the people. In introducing into Louisiana that part of the common law which constitutes the law and practice of courts of equity, the other part of the same system being concomitant, cannot be excluded; if it is to be done, or can be done, it is only by the legislative power.

These were my reasons for dissenting from the judgment heretofore rendered in this cause; they still operate on my mind, in their full force; they are, indeed, strengthened by the judgment now

[Livingston v. Story.]

given; which seems to me as repugnant to the former, as that was to all former ones, and the existing laws.

The controversy between these parties is respecting real property of great value; the plaintiff claims it, subject to the payment of a certain sum of money; the defendant claims it as his own absolutely, by purchase from the plaintiff, pursuant to several contracts made according to the forms of the law of Louisiana. The suit was commenced by a bill in equity, according to the form of process adapted to such courts; and contrary to the practice of the district court, from the first organization of a territorial government in Louisiana, in 1804, till the filing of the bill in 1834; vide Record, 2 to 6, 8 to 12. A demurrer was put in, assigning two causes. 1. That plaintiff had not set out such a case as entitled him to any discovery or relief in any court of equity in the state. 2. That by the bill it appeared that the transaction complained of, was between the plaintiff on one side, and the defendant and one Fort on the other, whose heirs were not made parties, Record, p. 7; 9 Peters, 6, 36: that this was necessary by the law and practice of Louisiana, was admitted. It was not a matter of mere form or practice, that the heirs of Fort should be made parties; the transaction was a joint one. Story had purchased from Fort, and paid him a large sum of money for his interest in the property: To Story therefore, it was highly important, that when the original transaction was to be unravelled, he should not alone be held answerable to the plaintiff, and be compelled to reconvey, without his partner being compelled to contribute. By the law of the state, he had a right to this protection; it was equitable too, that the plaintiff should be compelled to call into court all the parties who had been concerned: to the defendant it was but justice that he should not be put to his remedy against his associate, and the consequences be visited on him alone. This right to have the heirs of Fort brought in, was absolute, had the plaintiff sued in the mode prescribed by the law and practice of the state; it was a substantial benefit to Story, of which he could have been deprived in no other way, than on abrogation of the established course of proceeding, then in force in the state. This was done by the Court in overruling the demurrer on both points: they declared that the process act of 1792 applied to the case; and as the defendant, at the time of filing the bill, was the only person claiming or possessing the property, none other need be made a party, 9 Pet. 658, 9. By the terms of this act, "the forms and modes of proceeding in suits in equity, &c., which

[Livingston v. Story.]

are to be pursued in the federal courts, is not confined to the mere process employed;" it is to be "according to the principles, rules, and usages, which belong to courts in equity," &c. 1 Story, 258. When it is recollected, that there is no statute in England which defines the jurisdiction of these courts, or prescribes their course, the whole law or code of equity jurisprudence is necessarily made up of its own "principles, rules, and usages," which make it a system, as contradistinguished from that which prevails in courts of law. When too, we look to its adoption by the judiciary and process acts, it is at once apparent, that its effects go far beyond forms and practice; if it is in force in Louisiana, it does not stop at substituting an *English bill,* for *a civil law petition;* the whole law of equity, as a distinct code, necessarily accompanies it, by the very words of the act of 1792. So it must have been understood by the court, or they would have directed the heirs of Fort to be made a party to "a bill of equity;" as they must have done, had the proceeding been by petition. On this point their language is most explicit in using the very words of the act of 1792. "And that in the modes of proceeding, that court was required to proceed according to the principles, rules, and usages, which belong to courts of equity, as contradistinguished from courts of law," 9 Pet. 655. So again; "as the courts of the Union have a chancery jurisdiction in every state, and the judiciary act confers the same chancery powers on all, and gives the same rules of decision, its jurisdiction in Massachusetts," (and of course in Louisiana,) "must be the same as in other states." 656. And if no such laws and rules applicable to the case exist in Louisiana, then such equity powers must be exercised according to the principles, usages, and rules of the circuit courts of the United States, as regulated and prescribed for the circuit courts in the other states of the Union, 660. There can, therefore, be no mistake in considering, that the whole system of English equity jurisprudence henceforth is the law of Louisiana, both in form and substance, vide, 659; if the judgment first rendered in this case is the settled law of the land.

In its present aspect then, the suit must be taken as a bill in equity, to be decided on, and by the same principles, rules, and usages, which would form the law of equity in a circuit court of any other state.

In so viewing this case, there seem to me insuperable objections to the relief prayed for in the bill; even on the plaintiff's own showing, and the documents referred to.

[Livingston v. Story.]

The first contract between the parties was, in form, an absolute sale, in July 1822, for the consideration of twenty-five thousand dollars; of even date there was a defeasance or counter-letter, stipulating for a reconveyance, on payment of that sum in February 1823, and in case of nonpayment the property to be sold. In March 1823, an agreement was made, extending the time till June, stipulating the terms. The sale was postponed at plaintiff's request, and a new agreement made, whereby he was to pay Fort and Story twenty-seven thousand eight hundred and thirty dollars, on the 5th of August, otherwise the property was to be absoluto in them, and the defeasance to be cancelled, so as to bar any equity of redemption; the declared intention being, "to vest in Fort and Story a full title, in fee simple, forever." The plaintiff not paying the money, the defeasance was cancelled; and Fort and Story remained in the possession and enjoyment of the property In his bill the plaintiff alleges, that the original transaction was a loan of money, for the security of which the contracts were executed; and rests his whole case upon that allegation: he avers no fraud or unfairness on the part of Story or Fort, no ignorance of his rights, of any fact or matter in any way material to him, when the subsequent agreements were made. His only equity is in averring, that the property was worth more than the sum he had received, his inability to repay it, owing to the great pressure for money in 1822 and 3, the nonapplication of seven thousand dollars, which sum was to have been expended in improvements on the property; and that it was worth one hundred and twenty thousand dollars at the time of suit brought, in 1834. In such a case, a court of equity would look for the equity of the case in the acts of the plaintiff in March, June, and August, 1823; and if not satisfied that the release of all right of redemption, and the agreement that the right of Fort and Story should become absolute in fee simple, was made in ignorance by the plaintiff, or by fraud, or imposition by the defendant, the plaintiff could have no standing in court. Admitting the first contract to have been a mortgage, the parties voluntarily changed its nature on the application of the plaintiff; his object was to avoid a sale, and to gain time till the pressure subsided; but finding it continuing, he preferred making the transaction an absolute sale, rather than expose the property to a public sale during the pressure.

If better terms could have been obtained than were offered by Fort and Story, or if the averment in the bill that it was worth

60,000 dollars, in 1823, was true, it is incredible that the plaintiff should have been so desirous of keeping it out of the market; or that he would have entered into the agreement of June, if he could have obtained a better price from others. Be this, however, as it may, the mere inadequacy of price is of no consequence in equity; courts will never set aside a contract on this ground, if it is free from all other objections: the agreements of March and June were solemn, deliberate, and executed according to the solemnities of the civil law; and were binding by all the rules and principles of the English system of equity. By that law, Mr. Livingston was not a minor, deemed incapable of managing his own affairs; neither is ignorance of the law or facts of his own case, imputable to him; and he shows in his bill no reason why he should not be bound by his contracts, or why he should have them annulled.

As a mortgagor in the first instance, a court of equity would protect him against any unfair release of his equity of redemption to the mortgagee; yet, if fairly made, it would be as valid as if he had conveyed it to a third person. So far from any equity arising to him from the rise in the value of the property from 1823, till 1834; it is, in my opinion, a strong circumstance in favour of the defendant, who advanced his money during a severe pressure, when he could have purchased this property at auction, at a rate below its estimated value, proportioned to the demand for money, or have purchased from others. This ground of relief, however, entirely fails, when we consider the answer of the defendant; he denies the whole equity of the bill, as well as every allegation on which it rests; the answer is responsive to the bill, is full and explicit; and the plaintiff has not disproved one fact or averment contained in it; or proved any one matter averred in his bill. It is distinctly denied, that the original transaction was a loan; that the property was worth more than the sum to be paid for its reconveyance, or to prevent a sale; the non-application of the 7000 dollars is accounted for in a manner which throws on the plaintiff all its consequences; and shows it to have been by his own acts, and those of the person for whom he was surety to the defendant. These circumstances alone, would take from him any standing in a court of equity in England, or any circuit court of a state. Another view of the case is equally conclusive; on an inspection of the bill, answer, and exhibits.

The plaintiff did not rest his case on the documentary evidence; he averred the transaction to have been different from what was ex-

pressed in the written agreement; and called for the aid of a court of equity to compel the defendant to disclose the real nature and character of the original contract, and the true intention of the parties, on his oath. By this, he made the answer to the bill and interrogatories, evidence; it is directly responsive, full, and positive, and supported by evidence of the most satisfactory kind; the written application of the plaintiff's agent to Fort and Story, on the 13th July, preceding the first agreement. Vide ante, p. 360. No attempt was made by the plaintiff to prove the averment, that a loan was intended; so that there was nothing in the case which could vary the terms of the writing. The only original contract, was, then, the conveyance; and the defeasance, or counter-letter, taken in connection as one agreement, the terms of which show its legal character to be a conditional sale, and not a mortgage; when tested by the rules of equity as recognised by this Court.

To make such a transaction a mortgage, it is indispensable to show that the party receiving the money was bound to repay it; unless it clearly appears, from the evidence, that a loan was intended; and that the form of a sale was adopted as a cover for usury. The principal and interest must be secure; there must be a remedy against the person of the vendor or the borrower, and clear proof that he was liable. 7 Cr. 236, 7; 9 Pet. 445, to 454. If it is not proved by extrinsic evidence that a loan was intended, and the party bound to repay it, it matters not how extravagant the terms of repurchase may be: the redemption must be on the day stipulated; or the estate vests absolutely, if the principal was at hazard. Ib. 455, 459. Inadequacy of price is not a circumstance which will convert a conditional sale into a mortgage. 7 Cr. 241; and if the party makes no claim to the property while the other is in possession, making valuable improvements on it without any notice of an intention to assert a right of redemption, a court of equity will not aid him. 7 Cr. 240.

In the counter-letter, Mr. Livingston is not bound to repay the money; Fort and Story had no remedy against him; had the property sold for, or been worth less than the sum advanced, the loss was theirs. There is an averment in the bill that the plaintiff was liable; but it is expressly denied by the answer, and the plaintiff has not offered a spark of evidence to contradict it; the protest made in August was not to found an action; but was made as authentic evidence of the fact of nonpayment, and to silence the pretensions of the plaintiff, as is expressly sworn to in the answer. Rec. p. 19. It

is also positive as to the value of the property at the time, and after-
wards. " This deponent was repeatedly offered, after 1823, by John
A. Fort, the half of the property at cost and charges; which he re-
fused, considering the property not worth it. It has been only the
rise of all property in that part of the city where it is situated, that
has saved them from loss." Rec. 22.

Should it be thought worthy of inquiry, why they should pay for
the property more than it was worth in 1822 or 1823, the answer is
at hand. By the contract, eight thousand dollars of the money was
to be expended in improvements, which would have been so much
added to the value of the property; the plaintiff was security that
this sum should be so applied by Rust: trusting to this guaranty,
vide Record, 29, Fort and Story advanced the eight thousand dollars
to Rust; who misapplied it in the manner stated in the answer to the
interrogatories of the bill, Record, 22. In the answer it is also stated,
that plaintiff represented that a quantity of joists and iron work had
been found for the buildings then erecting; but, on inquiry, defend-
ant found they had not been paid for, and he and Fort had been com-
pelled to purchase them at a cost of one thousand three hundred and
seventy dollars. This sum, added to the seven thousand dollars mis-
applied by Rust, was a diminution of the value of the property more
than eight thousand dollars below what it would have been, if the
plaintiff had fulfilled his guaranty, and made good his representation;
and the work done would be worthless unless the buildings had been
made tenantable. Fort and Story had no option but to submit to
this loss, inasmuch as they had confided in the plaintiff, that he
would do what he had engaged to do, without holding him personally
bound to repay them the twenty-five thousand dollars; eight thou-
sand three hundred dollars of which was lost to them in the manner
stated. To save themselves, they were thus compelled to advance
this sum, to put the buildings in the state they were stipulated for,
when they made the agreement. Under such circumstances, no
court of equity could have considered the transaction a mortgage; or
the plaintiff as entitled to any relief.

On another ground, the plaintiff's case was divested of all semblance
of equity. He had laid by eleven years, after he had voluntarily
cancelled the counter-letter, and surrendered the property by an ab-
solute title in fee simple; during which time he had given no notice
of any claim on his part, or any intention to assert a right of redemp-
tion; while Fort and Story, to his knowledge, were making costly

[Livingston v. Story.]

improvements, under the full belief that they owned it; as the plaintiff had solemnly engaged that they should own and hold it. He waited till all risk was out of the question, when the speculation was a certain great one; and, in his own good time, comes into a court of equity, demanding a reconveyance, and offers to allow to Story five per cent. per annum for the use of his money: but refusing even to make the heirs of Fort a party; though the plaintiff knew, and stated in his bill, that Story, relying on his contract, had purchased out his interest at a large advance.

For this delay the bill assigns no reason or excuse, nor can any be found in the whole record; none has been offered in argument, none can exist to which any court of equity would listen, while it respected the principles laid down by this Court, at the same term in which this cause was first before it.

" A court of equity, which is never active in relief against conscience, or public convenience, has always refused its aid to stale demands, where the party slept upon his rights, or acquiesced for a great length of time. Nothing can call forth this Court into activity, but conscience, good faith, and *reasonable diligence.* When these are wanting, the Court is passive, and does nothing; laches and neglect are always discountenanced; and, therefore, from the beginning of this jurisdiction, there was always a limitation of suits in this Court. The same doctrine has been repeatedly recognised in the British courts, as will abundantly appear from the cases already cited. It has also repeatedly received the sanction of the American courts, &c. And it has been acted upon in the fullest manner by this Court, especially in," &c. Piatt v. Vattier, 9 Pet. 416, 17.

With submission, then, it must be asked, why this principle should not be applied to this case? There can be none which calls more loudly for it; it is a fundamental rule by which all courts of equity act: it is an essential part of that system of equity, which, in this very case, this Court, two years ago, held to be in force in Louisiana; as well in the principles and rules of decision, as in matters of practice, furnishing the law of the case, in place of the local law which was then suppressed. In Louisiana, ten years is a positive bar by limitation, when the law is applied; the principle of analogy, therefore, would apply to a shorter period than in other states, where the time of limitation is twenty years. In such a case, and circumstanced as this case is, the lapse of eleven years, wholly unaccounted for; would be as fatal to the plaintiff's claim in any court of equity,

in England; in any of the states, or in this Court; as if it had continued for any period, however long. The same question may be put as to the rules and principles on which equity acts, or would act, in annulling contracts like those of March, June, and August, 1823; also as to the established rules in deciding on what is a conditional sale, or a mortgage, as likewise declared at the same time; 9 Pet. 445, &c.

One answer has been given to all questions which can be put, if this case is to be decided by the English system of equity jurisprudence, as adopted by the process act of 1792, and declared to be a part of the law of Louisiana in 1835. It is now most solemnly adjudged, that this case is not to be determined by "the principles, rules, and usages, of courts of equity, as contradistinguished from courts of law;" that it depends on, and is governed by the Louisiana law of antechresis or mortgage; by which no length of possession, no amount expended in improvements, no laches of a mortgagor, however incompatible with every principle of common justice, or English equity, can bar a redemption without a sale. Nay, this law by the decree as now made, declares Mr. Livingston to be a minor, under a pupilage so strict, that his contracts, in relation to this property, are mere paper and packthread; and his pledged faith, that Fort and Story should hold and enjoy it, idle wind; because no sale was made, on account of his repeated and most urgent efforts to prevent it. He too, the distinguished jurist who revised and compiled codes for Louisiana, and was deeply versed in all the details of its laws; asks this Court to give him the benefit of this law of antichresis, on the only ground on which it can give him a decree for property, without irretrievably compromitting that, which he deemed far more valuable—his character.

Fort and Story did not intend to pay their money on such a contract as an antichresis. Mr. Livingston did not intend to mislead or deceive them by persuading them to waive a sale, which, under such a contract, was indispensable to bar his right of redemption; he did not cancel the counter-letter, and pledge himself that his equity of redemption was forever extinguished, knowing that the law incapacitated him from doing it. Fort and Story never contemplated that their only right to the property, was only a pledge upon it for their money and legal interest; nor could it have entered into their minds, that by indulging Mr. Livingston in avoiding a public sale, they were thereby giving him the sole benefit of their capital, expended in the

[Livingston v. Story.]

purchase and improvements, as well as the appreciation in value of the property. That an antichresis was ever in their minds, cannot be pretended; or that he knew that the contract was of that nature, and intended to avail himself of it, if a change of times should make it his interest to do so, when the property rose to a sufficient value, while he held out to Fort and Story that their title was perfect; is incredible. He must have been as ignorant of the law as they were, and both have intended the transaction as a conditional sale; in such a case, a court of equity would so reform the contract, as to make it conform to the real intention of both parties. On the other hand, if they intended the contract to be a conditional sale, and he intended it to be a mortgage; there is a fatal bar to this case.

It was laid down by this Court, in 1835, that where the contract was in terms a conditional sale, it would not be turned into a mortgage, or the money be deemed a loan; unless the intention to do so was mutual. 9 Pet. 450. That it was not so in this case, is manifest from the conduct of the defendant, and his positive oath in his answer; which decidedly negative any mutuality of intention.

There are, then, the following distinct grounds of defence, on equitable principles, to the plaintiff's bill. 1. He has failed in adducing any evidence, competent to vary the terms of the original contract. 2. He has shown no ground for annulling the subsequent contracts, or why they are not binding on him in equity. 3. All the averments in the bill are positively denied by an answer directly responsive, which remains uncontradicted, without an attempt to disprove any part of it, or to support the bill. 4. The plaintiff was never bound to repay the money; and the defendant incurred the whole risk of a depression in the value of the property. 5. The defendant never intended to enter into a contract of loan or mortgage. 6. The plaintiff is barred by the lapse of time and acquiescence, without notice.

If then the decree of this Court, at this term, had been rendered in accordance with those "principles, rules, and usages of a court of equity," which they adjudged two years before, to be the law of the case, the decree of the court below must have been affirmed; yet is now reversed, because the local law, which was wholly repudiated then, is applicable now. Herein there seems to me an utter discrepancy, between the two decrees of this Court. In 1835, the practice and law of Louisiana was displaced by the practice and law of equity; by the rules of which the demurrer was overruled, when it must have been sustained, if the act of 1792 had not been in force in that

state.  In 1837, the forms and modes of proceeding in equity are re-
tained; which deprive the defendant of the benefit of the law of the
state, compelling a plaintiff who sues for the redemption of mort-
gaged property, according to the law of antichresis, to join all the
original parties; in consequence whereof the plaintiff retained his
standing in court, which he must otherwise have lost.   The *law of
equity* having thus performed its appointed office, is, in its turn, dis-
placed by the state law, and ceases to be a rule of decision: *the law
of antichresis* is then brought in, to perform the final office of annul-
ling the contracts of the parties; taking the property from the de-
fendant, and awarding it to the plaintiff.   Now, if the law of anti-
chresis must govern this case, it is by sheer, dry, legal right; as desti-
tute of any equity as it is contrary to its most sacred principles,
when applied to such a case as this: by every rule of its action,
equity calls on the plaintiff to show "conscience" in his claim; "good
faith" in his conduct; and reasonable diligence in pursuing his rights,
before it moves one step.   Let the record answer how these calls have
been met.   In his bill, the plaintiff holds the defendant to the most
strict rules of accounting, as a trustee or agent; he offers to pay legal
interest, (which is five per cent.) on the money due in August, 1823;
say twenty-eight thousand dollars; which, for eleven years at the time
of filing the bill, amounts to fifteen thousand four hundred dollars: so
that defendant would be entitled to a credit, in account, of forty-three
thousand four hundred dollars, from which must be deducted twenty-
nine thousand seven hundred dollars, he had received for rents up to
1829, Record, 50; and at the rate stated, he would be indebted to the
plaintiff in 1834.   The plaintiff would then regain a property, stated
in his bill to be worth one hundred and twenty thousand dollars, and
by Mrs. Fort to be two hundred thousand dollars, and by the use of the
defendant's money; while Story is left to seek his remedy against her
for the fifty thousand dollars, paid her in 1832, for her share.   In his
offer, the plaintiff omits any credit to the defendant, for taxes on the
property, or compensation as his *bailiff and receiver*, for collecting
the rents of the buildings *erected with his own money;* as it now
seems for the plaintiff's use; on an interest of *five per cent. in New
Orleans*.   This is the *conscience* of the case.   Its *good faith* can
be ascertained by the stipulations, and solemnly declared intentions
of the plaintiff, in the contracts of March and June, 1823; Record, p.
278; the *cancellation* of the counter-letter; and after an utter silence
for eleven years, then, for the first time, asserting *the contract* to be

[Livingston v. Story.]

*an antichresis;* with *a perpetual right of redemption,* till a sale was made by its authority. *Reasonable diligence* would seem to consist in the plaintiff's pleasure; eleven years must be held not to be "a great length of time," under the circumstances of this case; or the utter silence, and want of notice for this period, must be held not to be an "acquiescence" in the defendant's right. It has been a truly fortunate result for the plaintiff, that with a case not sustainable by either the practice or law of Louisiana, or by the rules and principles of a court of equity, separately; he has been able to attain his object at one term, by one law, and at another term by the other; so happily applied, as to meet the exigencies of his case at both terms. Had the one law been made the rule of decision on the whole case, I might have acquiesced in the result: as it is, I am constrained to dissent from the whole course of proceeding; as in my settled judgment, in direct conflict with the acts of congress, as well as the repeated and most solemn adjudications of this Court.

I have not examined into the law of antichresis in Louisiana, for the want of the necessary books; conceding, however, that it is as the Court has considered it, it gives the plaintiff a sheer legal right, for the violation of which a court of equity is not the proper forum to resort: the right being in contravention of the fundamental principle of such courts, the remedy must be in a court which decides by the rules and principles of the civil law; to which code alone such a contract is known.

There is one other matter, on which I also dissent from the opinion of the Court; which has too important an effect on the rules of pleading and practice in suits in equity, to be passed unnoticed; and is in my opinion, a dangerous innovation, unsupported by principle or precedent.

From the preceding view of this case it is apparent, that if Mr. Livingston had been a citizen of Louisiana he could have sued only in the court of the state; his proceedings must have been according to its practice and laws, by which he must have made Mrs. Fort a party. Admitting his right to the property to be what this Court have held it, it would have placed the defendant in a very different position from that in which he now stands, without the least injury or inconvenience to the plaintiff. Mrs. Fort would have been compelled to refund the rents she had received, which, by the decree, the defendant must pay; together with the fifty thousand dollars she received from him, with the accruing interest; as well as the loss sustained by receiving only five per cent. on their capital; and pro-

[Livingston v. Story.]

bably paying to banks eight or ten per cent. as is usual in Orleans. Vide 3 Wheat. 146. By suing in a court of the United States, the plaintiff, by the aid of the process act of 1792, has protected Mrs. Fort, and thrown the whole loss on Mr. Story: leaving him the chances of a suit with her, in place of the certain remedy, that a state court would give him. To him it was no matter of form, practice, or mode of proceeding, whether he was sued in the one or the other court; it may be that his whole indemnity from Mrs. Fort depended on it: to the plaintiff it mattered not, so that he obtained the benefit of the law of antichresis, which the state court was bound to administer, as much as the court below was. The measure of justice to him was the same in both courts. It was by being a citizen of New York, that this court enabled the plaintiff to overrule the demurrer; by the application of the process act of 1792, the law of the case was changed; so that it was a most important fact in its bearing on the merits of the cause, not one affecting the form or mode of proceeding in the suit. It was averred in the bill, that the plaintiff was a citizen of New York: the defendant, in his answer, says, "that he does not admit, but if it be the fact, requires proof that the complainant is a citizen of the state of New York; that at the time of the transaction mentioned in the bill, and for a long time thereafter, he was a citizen of the state of Louisiana, and one of her senators in the congress of the United States; and if he has ceased to be a citizen of that state, the defendant knows not when, or how, and calls for proof." Rec. 16. To this part of the answer an exception was made, because the objection came too late after a demurrer had been overruled. Rec. 33. The exception was overruled, 36, and the general replication was filed. On the hearing, one deposition was read on the part of the plaintiff, to prove the fact; but in my opinion it failed to do so. This, however, was not deemed material by the court; who held, that the averment of citizenship could be controverted in no other way than by a plea in abatement: and that not having done so, the defendant was too late in reserving the denial till he answered; applying to the case the same rule which prevails as to pleas to the jurisdiction of a court of equity.

Had this been a suit by petition, according to the practice of the state, a denial of the citizenship or alienage could have been made in the answer, after a plea in bar, and the cause ordered for trial; it was so decided by this Court in 1833, declaring, that "the courts of Louisiana do not proceed by the rules of the common law;" "their

code is founded on the civil law, and our inquiries must be confined to its rules." 7 Pet. 429. This plea was offered after issue joined on a plea in bar, and after the argument had commenced. The court might admit it, and the court might also reject it. It was in the discretion of this Court to allow or reject this additional plea, Ib. 432. In 1 Pet. 612, it was decided, that a district court in a new state had "power to create a practice for its own government." The practice of the state courts adopted by the district judge of Louisiana, has been always recognised by this court, and acted on. 6 Pet. 198; 7 Pet. 429, 30; 8 Pet. 303. In Brown v. Keene, this very objection was taken in the *answer*, and considered by the Court; 8 Pet. 112, 116.

Such being the established practice of the court below, sanctioned by this Court, and the act of 1824; the plaintiff would have been bound to prove this averment, and considered himself so bound by the attempt to do it; but this Court has relieved him by expunging the state practice, and substituting what they assume to be the equity practice of courts of chancery in England. The consequence of which is, that the defendant is not allowed to deny by his answer, a fact averred in the bill, unless by a plea in abatement, in which he takes on himself the burthen of disproving it: of course, if he fails in doing so, the averment must be taken to be true, without any proof offered by the plaintiff to sustain it. That this decision of the Court is as repugnant to its own principles often declared, and to the rules of pleading in equity cases, as it is to the recognised practice of the court below; is clear to my mind.

By the 18th rule prescribed by this Court, "for the practice of the courts of equity of the United States;" "the defendant may at any time before the bill is taken for confessed, or afterwards with the leave of the Court, demur or plead to the whole bill, or part of it; and he may demur to part, plead to part, and answer to the residue," &c. 7 Wheat. ix.

By the 23d rule, "the defendant, instead of filing a formal demurrer or plea, may insist on any special matter in his answer; and have the same benefit thereof, as if he had pleaded the same matter or had demurred to the bill;" Ib. x.

When this case was before this Court two years ago, this was their language. "It is an established and universal rule of pleading in chancery; that a defendant may meet a complainant's bill by several modes of defence. He may demur, answer and plead to different parts of a bill," 9 Pet. 658. Such were the rules of equity *then*.

There must have been a great change in equity practice *since*, if a defendant may not now deny in his answer any averment in the bill; or call for proof of any fact averred, as to which he has not suficient knowledge, to be safe in admitting or denying it.

When he answered this bill, there was no rule of this or any court of equity, by which the averment of citizenship was exempted from the special rules of this Court, or "the established and universal rule of pleading in chancery:" it was not a *privileged* allegation, but like all others material to the plaintiff's standing in Court, he was bound to prove it when called on by an answer, which did not admit, or put it in issue by a denial. It is hard, indeed, on the defendant, that he suffers under the adoption of a rule unknown to the law or practice of equity; when he put in his answer, his counsel looked to the existing rules, after he found that the rules of the state practice had been superseded; and must have felt safe in following those which had been laid down as universal, in that opinion which fastened the equity code of England on the state and people of Louisiana. They had a right to confide in its future administration, according to the rules and principles promulgated by that tribunal; which by its own power imposed it on them. It has been held by this Court for more than forty years, that an express averment of citizenship is necessary to enable a citizen of one state to sue in the federal court of another; that it is a special privilege, conferred by the constitution and the judiciary act, to which the plaintiff must show his right by the record; that the averment must be positive, and not in the alternative, 8 Wheat. 112; that it must be in the body of the bill, and does not suffice that it is in the title or caption; that it is not only a fatal defect after a final decree; but is deemed so important that the judges feel bound to notice it, though counsel do not, 8 Pet. 148.

When the whole action of a court of equity on a bill, which does not, in its body, contain this averment in positive terms, is thus a mere nullity, and a final decree does not cure the defect: it is a most strange conclusion, that it cannot be denied by the answer, or the plaintiff be put to its proof; that as one of the *allegata* of the bill it is indispensable, while as one of the *probata*, it is immaterial. As the defect goes to the jurisdiction of the Court, it would seem consonant to reason, as well as to law, that if the averment of the fact was material, its truth was equally so; yet if the doctrine of the Court is sound, the defendant cannot put the plaintiff on proof of it, or make it a matter in issue on which he can adduce negative evidence. By

putting the defendant to his plea in abatement, the Court seem to me to have overlooked its requisites. Such a plea must be on oath; and it must give the plaintiff a better writ or bill, by pointing out how he ought to sue: such are its requisites in a suit of law or equity. 1 Day's Com. Dig. 151; 1 P. Wms. 477; Beame, 92, 3; 1 Ves. Sr. 203, 4.

The requisites of all pleas in equity are also overlooked. A plea must set up matter not in the bill; some new fact as a reason why the bill should be delayed, dismissed, or not answered; or the plea will be overruled; Mit. 177, 9; Beame, 2, 7; 2 Madd. R. 346, Am. ed.

The nature and effect of a plea to the jurisdiction of a court of equity, are also wholly misapprehended. It does not deny the plaintiff's right to relief, or that the bill does not contain matter proper for the cognisance of a court of equity; but it is made on the ground, that the court of chancery is not the proper one to decide it: it admits the jurisdiction of equity, but asserts that some other court can afford the remedy; Mit. 180; Beame, 57. This must be done by matter set up in the plea; because the court of chancery, being one of general jurisdiction in equity, an exception must be made out by the party who claims an exemption, in order to arrest its jurisdiction. Mit. 186; Beame, 57, 91; 1 Vern. 59; 2 Vern. 483; 1 Ves. Sr. 264. This objection must be by plea, and cannot be taken by demurrer: it must show what court has cognizance of the case: that it is a court of equity, and can give the plaintiff a remedy: if no circumstance can give jurisdiction to the court of chancery, then no plea is necessary; a demurrer is good; Mit. 123, 4; Beame, 100, 1; 1 Atk. 544; 1 Saund. 74; 1 Dick. 129; 3 Br. Ch. 301; 2 Ves. Sr. 357.

From this view of a plea to the jurisdiction of the court of chancery in England, it must be manifest that there is and can be no analogy between its jurisdiction and that of a circuit or district court, sitting as such: the former being general, attaches to every case not brought within an exception, by matter specially pleaded, showing that the case is cognizable in some inferior court of equity, competent to give the relief prayed: the latter is special, and limited to the cases specially enumerated, within which the plaintiff must bring himself, by averment and proof of the necessary fact. A denial of this fact does not oust an existing general jurisdiction; it puts in issue the only fact which can give the Court cognizance of the case: no fact or matter not in the bill, is set up by way of avoidance or delay, or as a reason for not answering; nothing is put in issue

but the truth of the allegation, in which the plaintiff claims a right and privilege denied to the citizens of Louisiana. He has claimed, and the Court have granted him a much higher privilege, than that of merely suing in a federal court; he is exempted from the obligation of suing, according to the law and practice of the state; the benefit of the equity code of England is given to him, and the defendant deprived of the right secured to him by the law of the state, that of having the heirs of his former partner made a party. The plaintiff's privilege is the defendant's oppression; the plaintiff is a favoured suitor; not because he is a citizen of New York in truth or in fact, but merely because he says in his bill that he is; and the defendant must submit to all the consequences of the averment being true, unless he will also consent to undergo the perils and inflictions of a plea in abatement. We have seen what its requisites are: now let them be applied to this case, and the consequences of such a plea. It must be on oath, the fact is not within his knowledge; he swears to a negative of a fact asserted in the bill, whereby he is compelled to incur the risk of perjury. As pleas in abatement in the court of chancery are governed by the same rules as in a court of law, 1 Ves. Sen. 203; Beame, 89, 90; there is another rule worthy of notice: "If the plaintiff take issue on a plea in abatement, and it be found against the defendant, then final judgment is given against him." 2 Saund. 111, a, note 3, and cases cited. He must therefore incur the danger of a final decree against him, if he does not make out his negative issue. His plea must be overruled, because it sets up no matter not in the bill. He must give the plaintiff a better writ or bill, by showing that some other court of equity has cognizance of the case: this is impossible in Louisiana, in which there is no such court: his plea is then bad, because he cannot comply with the requisites, unless it is incumbent on him to do it, in the only possible way left him. He can set up *new matter*, by averring that the plaintiff is a citizen of some other state than New York or Louisiana, and thus give the plaintiff a better bill: but then the same court would have jurisdiction, so that the plea would be nugatory, and subject the defendant to all the consequences which he sought to avoid. The reason given for the rule of pleading, in chancery, shows its entire inapplicability to a suit in a federal court. "The reason of this is, that in suing for his right, a person is not to be sent every where to look for a jurisdiction; but must be told what other court has jurisdiction, or what other writ is proper for him, and this is matter

[Livingston v. Story.]

of which the court, where the action is brought, is to judge." 1 Ves. Sr. 203.   The plaintiff knows his own residence.

It would be the most perfect anomaly in pleading, to draw up a plea to the jurisdiction of the court of chancery in the English form, and apply it to a bill in equity in a circuit court of the United States, so as to meet the averment of citizenship of the plaintiff; according to the present decision of this Court.   Its exhibition to an equity pleader in Lincoln's Inn, who would read our constitution, the judiciary act, the rules and decisions of this Court, would not fail to cause him to admire it as an improvement in the science of pleading.   For myself, I am utterly unable to comprehend, that the denial of an averment of a fact in a bill can be deemed a plea of any kind, unless it is the general issue, or a special issue on that fact; to be a plea in abatement, or in bar, every rule of pleading in law or equity requires that it should set up some matter not in the bill. And I can imagine no greater departure from the practice and principles of equity, than to deprive a defendant of the right of denying a fact stated in the bill, unless by exposing himself to the perils, and incurring the consequences of a plea in abatement.   If the decision now made, remains the law of the Court, the rule must be carried out to all its consequences.   Equity pleading is a science; its settled rules form an admirable system; but an innovation upon them would produce the most crying injustice.   To my mind, there cannot be a case which can more forcibly illustrate the dangerous effects than the present; when the record is examined, and its judicial history compared, throughout its progress to its present state, with the acts of congress, the rules of practice, and decisions of this Court.

For these reasons, I feel constrained to express my dissent to the whole course of the Court in this case: whether it is tested by the practice and law of Louisiana, or the English system of equity, it is an entire departure from both, if I can understand either.   The transition from the one system to the other, in the different stages of the cause, each operation to the manifest prejudice of the defendant; tends, in my opinion, to the worst of all consequences; utter uncertainty in the administration of the law in Louisiana.   If the legislative or judicial authority of the Union could command any respect, the process act of 1792, never did or could apply to that state: if both are overruled by one decision, it cannot be expected that the solemn adjudications of this Court will hereafter be deemed better evidence of its rules of practice, or the principles of equity, than they have been

in their bearing on the present case. My opinion on the general equity and merits of the case is as much at variance with that of the Court, as it is on the subjects to which my attention has been mainly directed: I have forborne an examination of this part of the case, for obvious reasons. Whether the property in question, however valuable, shall be held by the plaintiff, or defendant, is a matter of small concern, compared with the consequences which must follow from the decrees rendered; if the opinions and reasoning of the Court must henceforth be taken as the established law.

This cause came on to be heard on the transcript of the record from the district court of the United States, for the eastern district of Louisiana, and was argued by counsel. On consideration whereof, it is ordered and adjudged, and decreed, that the decree of the said district court, dismissing the bill of the complainant, be, and the same is hereby reversed and annulled; the Court being of opinion that the transaction of the 25th of July, 1822, between John A. Fort, Benjamin Story, and Edward Livingston, was a loan to the said Edward Livingston, secured by a pledge, denominated an antichresis, in the law of Louisiana. And it is hereby further ordered, adjudged, and decreed, that the cause be sent back for further proceedings in the court below, with directions that the cause be referred to a master, to take an account between the parties. And it is hereby further ordered, adjudged, and decreed, that in taking said account, there be allowed to the defendant all advances which shall be shown to have been made by him, or paid on account of the loan made to Edward Livingston, on the 25th day of July, in the year 1822, with the interest which the said Edward Livingston agreed to pay, of eighteen per cent. per annum, to be calculated upon cash advances, from the time it was made until the 5th of August, 1823, and after that time, at legal interest. And further, that in taking said account, the defendant be allowed all reasonable expenditures made by the defendant, and John A. Fort, in building, repairing, and safe keeping of the property pledged by the said Edward Livingston, to secure the loan made to him on the 25th day of July, 1822, and that the complainant be credited in such account with all such sums as the defendant, or John A Fort, or either of them have received from the said property; and that, in taking such account, the rents and profits be applied first, to the payment of the sums necessarily incur-

[Livingston v. Story.]

red in building and repairing. Secondly, to the payment of the interest on the sums which shall appear to have been advanced on the said loan, or in the improvement of the lot. And thirdly, to the discharge of the principal of the said loan. And if, on taking said account, it shall appear that there is a balance due to the complainant, it is hereby further ordered, adjudged, and decreed, that the defendant pay to the complainant such balance, within six months from the time of entering the final decree in the cause, and shall surrender and reconvey the said property to the complainant, or such person or persons as shall be shown to be entitled to the same. And if, upon the taking of said account, it shall be found that any balance is due from the estate of the said Edward Livingston, deceased, to the defendants, it is hereby further ordered, adjudged, and decreed, that on paying or tendering to the defendant the said balance, he shall deliver up the possession, and reconvey to the person or persons who shall appear to be entitled to the same, the property so pledged, to secure the aforesaid loan. And it is further ordered, adjudged, and decreed, that in case a balance shall be found due to the defendant, and shall not be paid within six months after a final decree of the district court, then the said property shall be sold at such time and on such notice as the said court shall direct; and that the proceeds be first applied to the payment of the balance due the defendant, and the residue thereof be paid to the complainant.

NOTE. Mr. Chief Justice TANEY, having been counsel in this cause, did not sit in the same.